IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Sandra S. Cary,                          :
               Petitioner               :
                                        :   No.  2581 C.D. 2015
        v.                              :
                                        :   Argued:  November 16, 2016
Bureau of Professional and              :
Occupational Affairs,                   :
State Board of Medicine,                :
               Respondent               :


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE ROBERT SIMPSON, Judge
           HONORABLE P. KEVIN BROBSON, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE JOSEPH M. COSGROVE, Judge


OPINION BY
JUDGE McCULLOUGH                              FILED:  January 31, 2017


        Sandra S. Cary (Cary) petitions this Court for review of the November
18, 2015 order of  the Bureau of Professional and Occupational Affairs, State Board
of  Medicine  (Board),  which  adopted  a  hearing  examiner's  adjudication
recommending that the Board deny Cary's application for licensure as a behavior
specialist, and rejected her exceptions to the hearing examiner's adjudication.  The
sole reason the Board denied Cary's application for licensure was because the
educational institution at which she received her Master's Degree in Counseling
Psychology, Emmanuel Baptist University, a now-defunct entity, did not appear to be
accredited by either of the two institutional organizations that the Board informally

designated as acceptable accrediting bodies. Upon review, we reverse the Board's order and remand to the Board with direction to grant Cary a license.

## Statutory and Regulatory Background

By way of background, in 2008, the General Assembly adopted amendments to the Insurance Company Law of 1921 (Insurance Law),[1] addressing insurance coverage for the diagnosis and treatment of individuals under the age of twenty-one who are or may be on the autism spectrum. In this legislation, sometimes called "Act 62,"[2] the General Assembly – apparently for the first time in the Commonwealth's history – imposed licensure requirements for a "behavior specialist."[3] Among other things, these requirements mandate that an applicant seeking a license demonstrate that he or she "[h]as received a master's or higher degree from a *board-approved, accredited college or university*, including a major

---

[1] Act of May 17, 1921, P.L. 682, *as amended*, 40 P.S. §§341-1007.15.

[2] Section 635.2 of the Insurance Law, added by the Act of July 9, 2008, P.L. 885, 40 P.S. §764h.

[3] Section 635.2(f)(4) of the Insurance Law defines "behavior specialist" as:

> [A]n individual who designs, implements or evaluates a behavior modification intervention component of a treatment plan, including those based on applied behavioral analysis, to produce socially significant improvements in human behavior or to prevent loss of attained skill or function, through skill acquisition and the reduction of problematic behavior.

40 P.S. §764h(f)(4).

course of study in . . . counseling psychology[.]" Section 635.2(g)(2)(ii) of the Insurance Law, 40 P.S. §764h(g)(2)(ii) (emphasis added).[4]

Pursuant to section 635.2(g)(1) of the Insurance Law, the General Assembly expressly authorized the Board to "promulgate regulations providing for the licensure or certification of behavior specialists." 40 P.S. §764h(g)(1). Relevant for our purposes, the Board exercised this authority by promulgating the regulation at

---

[4] The educational requirements are as follows:

> (2) An applicant applying for a license or certificate as a behavior specialist shall submit a written application on forms provided by the State Board of Medicine evidencing and insuring to the satisfaction of the board that the applicant:
>
> (i) Is of good moral character.
>
> (ii) Has received a master's or higher degree from a board-approved, accredited college or university, including a major course of study in school, clinical or counseling psychology, special education, social work, speech therapy, occupational therapy or another related field.
>
> (iii) Has at least one year of experience involving functional behavior assessments, including the development and implementation of behavioral supports or treatment plans.
>
> (iv) Has completed at least one thousand (1,000) hours in direct clinical experience with individuals with behavioral challenges or at least one thousand (1,000) hours' experience in a related field with individuals with autism spectrum disorders.
>
> (v) Has completed relevant training programs, including professional ethics, autism-specific training, assessments training, instructional strategies and best practices, crisis intervention, comorbidity and medications, family collaboration and addressing specific skill deficits training.

Section 635.2(g)(2) of the Insurance Law, 40 P.S. §764h(g)(2).

49 Pa. Code §18.524(a), which tracks the pertinent statutory language and provides that "[a]n applicant for licensure as a behavior specialist shall satisfy the Board that the applicant . . . has received a master's or higher degree from a *Board-approved, accredited college or university*[.]" *Id.* (emphasis added).

The Board, however, did not promulgate any regulation with respect to what exactly is an "approved" or "accredited" college or university or how one is determined to belong in this class. Instead, through an informal statement of policy contained in the Board's letters denying applications, the Board stated that it only recognizes the Council for Higher Education Accreditation (CHEA) and the United States Department of Education (USDE) as accrediting entities for the purpose of determining whether an applicant's degree was obtained from a "Board-approved, accredited" university. (Reproduced Record (R.R.) at 165a.) Notably, there is no "grandfather clause" in the Insurance Law or the Board's regulations that would permit experienced individuals who have practiced as a behavioral specialist to obtain a license based upon that experience.[5]

**Facts and Procedural History**

On March 27, 2013, Cary filed an application for a behavior specialist license with the Board, which provisionally denied the application. The matter was then assigned to a hearing examiner who convened an evidentiary hearing. After

---

[5] *See* Document Prepared by the Department of Public Welfare (DPW), with input from the Board, regarding frequently asked questions by applicants for a behavior specialist license, created May 23, 2014, and located at http://164.156.7.185/parecovery/documents/BSC-ASD_FAQ.pdf; *Gray v. Bureau of Professional & Occupational Affairs*, (Pa. Cmwlth., No. 1691 C.D. 2014, filed July 10, 2015) (unpublished), slip op. at 6 (observing that there is no "grandfather clause" in the Insurance Law for the licensure of behavior specialists).

4

evaluating the evidence of record, the hearing examiner made the following findings of fact:

> 2.    [Cary] holds a Bachelor of Science Degree in Counseling from the Carolina Christian University.
>
> 3.    [Cary] holds a Master of Science Degree in Counseling Psychology awarded by Emmanuel Baptist University on September 4, 1990.
>
> 4.    Emmanuel Baptist University was part of Emmanuel School of Religion.
>
> *    *    *
>
> 6.    After review of [Cary's] application for licensure as a behavior specialist and related documents, the Board denied her application for licensure as a behavior specialist in the Commonwealth of Pennsylvania by letter dated October 21, 2013.
>
> 7.    [Cary] was notified that the reason for the denial of her application for licensure was that she did not meet the educational requirements mandated by Act 62, which requires that [an] [a]pplicant shall have attained a master's degree or higher from a Board-approved, accredited college or university.
>
> *    *    *
>
> 9.    Board regulations require that an applicant for licensure as a behavior specialist in Pennsylvania shall satisfy the Board that the applicant has received a master's or higher degree from a Board-approved, accredited college or university.
>
> 10.    The [Insurance Law] requires that an applicant applying for a behavior specialist license in Pennsylvania shall submit evidence that the applicant has received a master's or higher degree from a Board-approved, accredited college or university.

5

11. The Board recognizes the [CHEA] or [USDE] as accrediting bodies for graduate education.

12. [Cary's] non-certified transcripts from Emmanuel Baptist University . . . indicate accreditation by Southern Association of Christian Schools, The American Association of Theological Institutions, and American Accrediting Educational Association of Christian Schools.

13. In reviewing [Cary's] application for licensure, the Board determined that in receiving her Master's of Science Degree in Counseling Psychology from Emmanuel Baptist University, [Cary] did not meet the Board's requirement that she receive a master's or higher degree from a Board-approved, accredited college or university . . . .

14. Emmanuel Baptist University . . . is closed and no longer in existence.

15. [Cary] cannot now prove that Emmanuel Baptist University was a Board-approved accredited university at the time [she] received her Master's of Science Degree in Counseling Psychology in 1990.

16. [Cary] completed all other requirements for licensure, including online course work mandated by the Board.

\* \* \*

18. [Cary] was employed by Behavioral Dynamics from 2005 until 2013 as a behavioral specialist consultant, mobile therapist, strength based therapist, community liaison and training coordinator.

19. As part of her job functions as a behavioral specialist consultant and mobile therapist with Behavioral Dynamics, [Cary] worked with autistic children and has particular expertise in that area through both experience and raising an autistic child.

20.    [Cary] excelled at her job as a behavioral specialist consultant [and was terminated from her position with Behavioral Dynamics after she was denied a license].

(Findings of Fact (F.F) at Nos. 2-4, 6-7, 9-16, 18-20) (citations to record omitted).

From these facts, the hearing examiner determined that Cary failed to sustain her burden of proving that she obtained a master's degree from a Board-approved university.   (Conclusions of Law at Nos. 1-7.)   The hearing examiner explained:

> The criteria for licensure as a behavior specialist include having received a Master's or higher degree from a Board-approved, accredited college or university.  While [Cary] did receive a master's degree in one of the fields specified in the [Insurance Law] and the Board's licensure regulations, [she] could not provide documentation that Emmanuel Baptist University was a Board-approved, accredited university.  The Board recognizes [CHEA] or the [USDE] as accrediting bodies for graduate education. [Cary's] non–certified transcripts from Emmanuel Baptist University . . . indicate accreditation by Southern Association of Christian Schools, The American Association of Theological Institutions, and American Accrediting Educational Association of Christian Schools.
>
> In reviewing [Cary's] application for licensure, the Board determined that . . . [Cary] did not meet the Board's educational requirement that she receive a master's or higher degree from a Board-approved, accredited college or university.  Emmanuel Baptist University is closed and no longer in existence, and [Cary] cannot now prove that Emmanuel Baptist University was a Board-approved accredited university at the time [she] received her Master of Science Degree in Counseling Psychology in 1990. [Cary] was unable to contact the school or its parent school, Emmanuel School of Religion, to obtain the necessary information.
>
> Although the Board has not questioned [Cary's] experience, the Board is unable to grant [her] licensure when she has

not met the educational requirements set forth in the [Insurance Law] and the Board's regulations . . . . The Board cannot ignore the legislature's mandate to accommodate [Cary] in this unfortunate instance.

(Hearing Examiner's decision at 9-10.)

Cary filed exceptions to the hearing examiner's recommended decision with the Board. By order dated November 18, 2015, the Board dismissed Cary's exceptions and adopted the hearing examiner's proposed adjudication and order denying Cary a behavior specialist license.

## Discussion

Before this Court, Cary points to the facts that she: received her master's degree from Emmanuel Baptist University over twenty-five years ago, in 1990, and the university is now defunct; has no ability to obtain information from any source regarding the university's accreditations; was terminated from her position as a behavioral specialist with Behavioral Dynamics because she could not obtain a license; and has thereafter suffered a dramatic decrease in her yearly income. Cary also emphasizes that she has met all the other requirements for licensure and highlights testimony from her employer and co-workers evidencing that her job performance as a behavior specialist was exemplary.

Grounded in this factual basis, Cary contends that Section 635.2(g)(2)(ii) of the Insurance Law, the regulation at 49 Pa. Code §18.524(a), and the Board's policy of approving only CHEA and the USDE violates her substantive due process rights because these legal measures are arbitrary and lack a rational relationship to a legitimate governmental purpose. Cary further posits that the Board's decision and application of the Insurance Law and its regulations had the retroactive effect of impairing her employment contract in violation of the constitution.

8

In addition, Cary asserts that the Board's recognition of CHEA and the USDE in a denial letter is a statement of policy, attempting to be a regulation with the force of law, and is a legal nullity because the policy was never promulgated in accordance with statutory requirements. Cary maintains that, consequently, "the Board could have considered the accrediting bodies of Emmanuel Baptist and approved them to grant her [a] license" and that "[t]he Board arbitrarily and capriciously declined to consider any other accrediting bodies." (Cary's Supplemental Brief at 4.) Cary also avers that because the statement of policy is void, the Board could not deny her a license "based on her inability to prove her master's degree was from a college or university accredited only by the CHEA or USDE." *Id.*

Upon review, we agree with Cary that the Board acted arbitrarily and capriciously in denying her application for a behavior specialist license.

This Court's scope of review of Board decisions is limited to determining whether the Board committed constitutional violations, and/or errors of law, or whether any necessary findings of fact are unsupported by substantial evidence. *Bethea-Tumani v. Bureau of Professional and Occupational Affairs, State Board of Nursing*, 993 A.2d 921, 925 (Pa. Cmwlth. 2010). To determine whether an agency's decisions are "in accordance with the law," appellate review of the agency's conclusions is designed "to ensure that they are adequately supported by competent factual findings, are free from arbitrary or capricious decision making, and, to the extent relevant, represent a proper exercise of the agency's discretion." *Fraternal Order of Police, Conference of Pennsylvania Liquor Control Board Lodges v. Pennsylvania Labor Relations Board*, 735 A.2d 96, 99 (Pa. 1999).

Our precedent states as a rule that administrative action is "arbitrary and capricious where it is unsupportable on any rational basis because there is no evidence upon which the action may be logically based." *Lynch v. Urban Redevelopment Authority of Pittsburgh*, 496 A.2d 1331, 1335 (Pa. Cmwlth. 1985). The United States Supreme Court has summarized the concept of arbitrary and capricious as follows:

> The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. In reviewing that explanation, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment . . . .
>
> The reviewing court should not attempt itself to make up for [an agency's] deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given.

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983) (citation and internal quotation marks omitted).

As an illustrative example, in *Adams County Interfaith Housing Corp. v. Prevailing Wage Appeals Board*, 981 A.2d 352 (Pa. Cmwlth. 2009) (en banc), the Secretary of Labor and Industry declined to implement a wage rate classification for residential construction under the Pennsylvania Prevailing Wage Act (Act).[6] After noting that "the Secretary offered no reasoning whatsoever for refusing to promulgate" such a classification, *id.* at 358, this Court observed that the Secretary

_____

[6] Act of August 15, 1961, P.L. 987, *as amended,* 43 P.S. §§165-1-165-17.

10

decided that residential construction does not need to be included within or determined as a wage rate classification. We concluded: "Although the Secretary has the discretion to make such determination, as discussed earlier, that determination must have some rational basis. The Secretary offered no rational basis for his refusal, which therefore constitutes arbitrary and capricious action." *Id.* (citation omitted).

*State ex rel. Westercamp v. State Board of Chiropractic Examiners*, 352 P.2d 995 (Mont. 1960), provides guidance. In that case, the applicants sought licenses to practice chiropractic in Montana but the state board denied the licenses because the applicants' school had not been approved by the board. Pursuant to a statute vesting the board with the duty to approve acceptable chiropractic colleges, the board passed a code approving the schools that were accredited by the National Chiropractic Association (N.C.A). Notably, the board did not conduct any personal inspection of any of the schools it approved and its approval was based on information received from the N.C.A. On appeal, the applicants argued, among other things, that the board's action in refusing to approve the applicants' school and reliance upon the N.C.A. "was so arbitrary that it amounted to no exercise of discretion at all[.]" *Id.* at 997.

On appeal, the Supreme Court of Montana agreed with the applicants. In doing so, the court noted that the board no made no investigation of the merits of the school, but relied solely on the recommendation of the N.C.A, whose own regulations precluded consideration of the applicants' school because the school was not structured as a non-profit organization. The court held:

> We need not decide whether this sole reliance [on the N.C.A.] by the Board is an invalid delegation of power. But it is such a manifest abuse of discretion as to amount to a failure to act at all. We are not prepared to say that consideration cannot properly be given to recommendations

11

of an association of practitioners which fairly represent the profession and which strive to promote the highest standards of professional educational preparation. In this case, however, where no facts were before the Board for approval purposes save the fact of non-approval by the N.C.A. [and the N.C.A.'s] regulations preclude consideration in the first instance because of the corporate structure of the school, the Board has failed to perform its duty as prescribed by law.

*Id.* at 999 (citation omitted). Accordingly, the court in *Westercamp* granted the applicants a writ of mandamus mandating that the board grant the applicants a license upon condition that the applicants successfully complete an examination.

Our decision in *Whymeyer v. Department of State, Bureau of Professional and Occupational Affairs, State Registration Board for Professional Engineers, Land Surveyors and Geologists*, 997 A.2d 1254 (Pa. Cmwlth. 2010), is also instructive. There, a state licensing board denied the applicant the opportunity to take an engineering examination because the applicant's undergraduate degree was not from a board-approved engineering school. The statute and regulation at issue in *Whymeyer* required that an applicant graduate from "an approved engineering curriculum" and a subsection to a regulation defined "engineering curriculum" to mean "[a] curriculum of 4 or more years approved by a *National accrediting association* recognized by the Board which leads to a baccalaureate degree . . . ." *Id.* at 1258 (emphasis in original). The Board, ostensibly by means of an informal policy statement, used accreditation from the Accreditation Board in Engineering and Technology (ABET) to determine whether an applicant has graduated from an approved engineering curriculum, and the applicant's school was not accredited by this organization. During the hearing, the applicant established that his school was accredited by another institutional body and attempted to demonstrate that the school from which he graduated was worthy of accreditation from the ABET.

12

In addressing the applicant's constitutional challenge to the regulation on vagueness grounds, this Court noted that the statute and regulation vested the Board with discretion and authority to determine on a case-by-case basis whether a university should be "board-approved." We then concluded:

> Clearly, to the extent that the Board does not rely exclusively on ABET accreditation but exercises its independent judgment regarding an engineering program that lacks ABET approval, the regulation . . . is not void as applied.
>
> Here, however, the Board did not exercise its independent statutory authority to evaluate the [u]niversity's electrical engineering program, but specifically declined to do so, relying exclusively on the lack of ABET accreditation. Accordingly, we find that the regulation was unconstitutionally applied in this case, and so reverse the order of the Board. In addition, we remand this matter to the Board with directions to permit [the applicant], upon application, to sit for the fundamentals of engineering examination.

*Id.* at 1260 (citations omitted).

In this case, Section 635.2(g)(1) of the Insurance Law is remarkably similar to the governing statutes in *Westercamp* and *Whymeyer* and grant the Board the authority to determine, independently and on its own initiative, the educational merits of any particular school. While the board in *Westercamp* was precluded by its own code from engaging in such an assessment, and the board in *Whymeyer* decided not to undertake such an inquiry, the critical fact is that the boards in both of those cases possessed the statutory power to approve schools in a manner that they deemed fit, but relied exclusively on a designated institutional body to determine which schools will be accredited. The gist of the situation is no different here. Although Emmanuel Baptist University is no longer in existence, the school was accredited by

13

Southern Association of Christian Schools, The American Association of Theological Institutions, and American Accrediting Educational Association of Christian Schools. As such, the Board could have examined these accreditations, along with Cary's course work, and performed some kind of comparative analysis to determine if Emmanuel Baptist University was an "accredited college or university" or should be "board-approved." 40 P.S. §764h(2)(ii). However, the Board did not conduct or undertake this task, and if the Board exercised any discretion in denying Cary's application for a license, it was when the Board chose CHEA and the USDE as the accrediting entities.

And herein lies the heart of the problem; that is, the manner and way in which the Board recognized CHEA and the USDE. In its brief, the Board admits that it "has never formally promulgated regulations defining 'Board-approved, accredited college or university'" and claims that "its recognition of [CHEA] and the [USDE] is a statement of policy rather than a binding norm with the effect of law." (Board's Supplemental Brief at 3).

Our Supreme Court has explained the distinction between a statement of policy and a regulation, which is also known as a binding norm, as follows:

> An administrative agency has available two methods for formulating policy that will have the force of law. An agency may establish binding policy through rulemaking procedures by which it promulgates substantive rules, or through adjudications which constitute binding precedents. A general statement of policy is the outcome of neither a rulemaking nor an adjudication; it is neither a rule nor a precedent but is merely an announcement to the public of the policy which the agency hopes to implement in future rulemakings or adjudications. A general statement of policy, like a press release, presages an upcoming rulemaking or announces the course which the agency intends to follow in future adjudications.

14

\* \* \*

The critical distinction between a substantive rule and a general statement of policy is the different practical effect that these two types of pronouncements have in subsequent administrative proceedings . . . . A properly adopted substantive rule establishes a standard of conduct which has the force of law . . . . The underlying policy embodied in the rule is not generally subject to challenge before the agency.

A general statement of policy, on the other hand, does not establish a 'binding norm.'   [It is not finally determinative of the issues or rights to which it is addressed.  The agency cannot apply or rely upon a general statement of policy as law because a general statement of policy only announces what the agency seeks to establish as policy.]

*Pennsylvania Human Relations Commission v. Norristown Area School District*, 473

374 A.2d 671, 679 (Pa. 1977) (citations and footnotes omitted).

This Court has further elaborated:

The process by which regulations are issued provides an important safeguard for potentially affected parties against the unwise or improper exercise of discretionary administrative power.  This process, which includes public notice of a proposed rule, making a request for written comments by any interested party, giving due consideration to such comments, and holding hearings as appropriate, affords the affected parties a democratic process for participation in the formulation of standards which govern their conduct and increases the likelihood of administrative responsiveness to their needs and concerns.  Moreover, it gives the administrative agency facts and information relevant to the proposed rule, as well as opens up the agency to alternatives, detrimental effects, criticism and advice, thereby contributing to the soundness of the proposed regulation.  Not only is sound regulation promoted by this process, but it increases the likelihood of administrative responsiveness to the needs and concerns of those affected, because it promotes acquiescence in the

15

result, even when the objections of those affected remain the same as to substance.

Statements of policy, however, need not be subject to notice and comment because, presumably, they only provide guidance by which administrative agency personnel carry out their power delegated to them by the General Assembly. Statements of policy are generally considered less structured and significant and, for those reasons, effect the agency belief that a policy is not sufficiently developed to be issued as a regulation.

\*     \*     \*

[A] regulation is not defined substantively by what it is, but rather procedurally — by how it is issued . . . . It would appear that under the Commonwealth Documents Law [CDL[7]], the only difference between a regulation and statement of policy is how the agency pronouncement is issued. A statement of policy is transformed into a regulation by undergoing notice and comment pursuant to [the CDL and other formal requirements for promulgation.]

*Department of Environmental Resources v. Rushton Mining Co.*, 591 A.2d 1168, 1171-72 (Pa. Cmwlth. 1991).

We also set forth the detailed procedure for promulgating a regulation as follows:

The basic procedures by which an agency promulgates a regulation are set forth in the [CDL]. In essence, these procedures require an agency to give notice to the public of its proposed rule-making and an opportunity for the public to comment. However, this is only the beginning. The agency must also obtain the approval of the Attorney

---

[7] Act of July 31, 1968, P.L. 769, *as amended,* 45 P.S. §§ 1102-1602, and 45 Pa.C.S. §§ 501-907, which, collectively, are known as the "Commonwealth Documents Law." This was the official short title of the 1968 enactment. *See* Section 101 of the Act of July 31, 1968, P.L. 769.

16

General and the General Counsel of a proposed regulation's form and legality. Sections 204(b) and 301(10) of the Commonwealth Attorneys Act, Act of October 15, 1980, P.L. 950, 71 P.S. §§732-204(b) and 732-301(10). Finally, an agency's regulation must also undergo legislative scrutiny in accordance with the Regulatory Review Act, [Act of June 25, 1982, P.L. 633, *as amended,* 71 P.S. §§745.1-745.12.] . . . . Section 5 of the Regulatory Review Act requires the agency to submit its proposed regulation to the appropriate committees of the Senate and House of Representatives; undergo public notice and a comment period; and obtain approval of the Independent Regulatory Review Commission. 71 P.S. §745.5.

*Borough of Bedford v. Department of Environmental Protection*, 972 A.2d 53, 62 & n.12 (Pa. Cmwlth. 2009) (en banc).

Regardless of the label an agency attaches to that which it devises, "[a] determination as to whether a particular statement of policy is an unpromulgated regulation is a question of law." *Eastwood Nursing and Rehabilitation Center v. Department of Public Welfare*, 910 A.2d 134, 140 (Pa. Cmwlth. 2006). Instantly, the so-called statement of policy has all the characteristics of a binding norm or substantive regulation, with the purported force of law. Importantly, the statement of policy is not applied in a discretionary manner; instead, it was crafted by the Board to be used as the legal guidepost to determine unconditionally, and in all instances, whether the educational accreditation requirements for licensure are met. *See Giant Food Stores v. Department of Health*, 713 A.2d 180, 182 (Pa. Cmwlth. 1998) (concluding that a handbook was a regulation, rather than a statement of policy, where the agency denied an applicant store recertification "based solely on its failure to strictly satisfy the 'selection and limitation' criteria in the Handbook" and the "Handbook [did] not give any discretion at all to the [agency] to recertify a store that does not absolutely meet all of the selection and limitation criteria."). Despite possessing the hallmarks of a traditional regulation, the Board's statement of policy

17

was never enacted pursuant to procedures in the CDL, which must be followed in order to properly promulgate a regulation.

Therefore, because the statement of policy was never promulgated as a regulation, the statement of policy is void as a matter of law, is not entitled to any form of administrative deference or presumption of reasonableness, and cannot be used as the means by which to deny Cary a license. *See Northwestern Youth Services, Inc. v. Department of Public Welfare*, 1 A.3d 988, 992 (Pa. Cmwlth. 2010) ("If an agency fails to properly promulgate a regulation in accordance with the CDL, we will declare the pronouncement a nullity."); *Woods Services, Inc. v. Department of Public Welfare*, 803 A.2d 260, 264-66 (Pa. Cmwlth. 2002) (concluding that agency could not deny an applicant a license based upon the agency's "preference for small facilities over larger ones" where the agency's preference was never promulgated as a regulation); *cf. Eastwood Nursing and Rehabilitation Center*, 910 A.2d at 141-42 ("It is well settled law that an agency's substantive regulations, when properly enacted under the [CDL] have the force and effect of law and enjoy a general presumption of reasonableness.").

Without a valid regulation formally adopting CHEA and the USDE as accrediting agencies, it was absolutely imperative for the Board to articulate a legitimate rationale accounting for why it chose CHEA and the USDE as the only accrediting bodies. The Board also should have set forth a reason as to why CHEA and/or the USDE are more suitable than the Southern Association of Christian Schools, The American Association of Theological Institutions, and American Accrediting Educational Association of Christian Schools, or, at the very least, provided a statement justifying why the entities in the latter category were not chosen as accrediting bodies. However, as in *Adams County Interfaith Housing Corp.*, the

Board "offered no reasoning whatsoever" or a "rational basis" for its choices in these regards and has not sufficiently defended it exercise of discretion. 981 A.2d at 358. Indeed, here, the Board did not even proffer an explanation as to how or in what manner it picked CHEA and the USDE or how or in what manner CHEA and the USDE pick institutions for accreditation. While it is certainly conceivable that the Board made an informed decision and had legitimate reasons to choose these entities, it is equally plausible, without evidence or argumentation to prove otherwise, that the Board's choice was not so based and was instead arbitrary. Absent substantiation in the record, there is no basis upon which to determine how CHEA and/or the USDE accredit schools, whether it be reliable and non-discriminatory or not. As such, this Court is unable to discern from the record how the Board exercised its discretion in selecting CHEA and the USDE, and the Board has failed to shed any meaningful light with respect to the particulars of its decision.

To survive judicial scrutiny, the Board "must examine the relevant data and articulate a satisfactory explanation for its action," and this Court "may not supply a reasoned basis for the [Board's] action that the [Board] itself has not given." *Motor Vehicle Manufacturers Association*, 463 U.S. at 43. Therefore, absent a satisfactory explanation as to why the Board decided that only CHEA and the USDE would be accrediting bodies, this Court is constrained to conclude that the Board's order denying Cary a license was based on an arbitrary and capricious exercise of discretionary power.

**Conclusion**

With the exception of proving that she obtained her master's degree from a Board-approved school, the Board determined Cary has satisfied all the requirements necessary to obtain a behavioral specialist license. (F.F. at 15-16.)

19

Having concluded on the current record that the Board acted arbitrarily and capriciously when it determined that Cary did not meet the educational requirements for licensure, because it did not promulgate any regulation and did not provide any legitimate rationale for choosing CHEA and the USDE as the accrediting bodies, the Board cannot use this as a basis upon which to deny Cary a license. Accordingly, we reverse the Board's order and remand to the Board with instruction to issue Cary a behavioral specialist license.[8]    Because this Court's conclusion rests on non-

---

[8] The Dissent would remand to the Board to engage in some type of independent inquiry regarding the merits of Emmanuel Baptist University as an institution and Cary's course of study. In advancing this proposal, the Dissent fails to appreciate the fact that the General Assembly delegated the task of determining what is a "board-approved, accredited" school to the Board itself. Our role as the judiciary is not to order the Board to engage a specific mode of analysis to determine what is a "board-approved, accredited" school. Moreover, as a practical matter, without any presently known or stated criteria to now determine what is a "board-approved, accredited school," it is most likely that if this Court were to remand to the Board to take another look at Cary's application, the Board's second decision would be even more arbitrary.

Nonetheless, the dispositive fact is that in implementing its licensing regime, the Board decided to rely exclusively on accreditation by CHEA and the USDE, which, as the Dissent appears to agree, constituted an arbitrary and capricious exercise of administrative power and an unlawful basis upon which to deny Cary a license. In *Whymeyer*, where this Court concluded that the Board denied the applicant the right to take a certification test on the unlawful basis that the applicant's school was not accredited by the ABET in accordance with an informal requirement of the Board, we reversed the Board and remanded to the Board with express direction to permit the applicant to take the test. The relief the Majority grants Cary is no different than that granted by this Court to the testing applicant in *Whymeyer*.

Contrary to the Dissent's pronouncement, there is nothing in the Majority opinion that can reasonably be construed as "a tacit approval of Emmanuel Baptist University," (Dissent op. at 2), and we fail to see how or from what language the Dissent draws such a conclusion. Our decision is based upon the Board's arbitrary and capricious exercise of power which thereby resulted in an unlawful denial of Cary's license. Following our decision, the Board is free to implement a new policy or promulgate a regulation for future licensing cases. In allowing the Board to decide for itself how it wants to determine in the future what is a "board-approved, accredited" school, we believe that our course of action is prudent and respectful of the Board's statutory delegation of legislative power.

20

constitutional grounds, we decline to entertain any of the constitutional issues that Cary raises. *See In re Fiori*, 673 A.2d 905, 909 (Pa. 1996) ("[C]ourts should avoid constitutional issues when the issue at hand may be decided upon other grounds.").


_____
PATRICIA A. McCULLOUGH, Judge


Judge Wojcik dissents.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Sandra S. Cary,                               :
               Petitioner          :
                           :   No. 2581 C.D. 2015
           v.                       :
                           :
Bureau of Professional and                    :
Occupational Affairs,                         :
State Board of Medicine,                       :
              Respondent           :

## ***ORDER***

AND NOW, this 31ˢᵗ day of January, 2017, the November 18, 2015 order of the Bureau of Professional and Occupational Affairs, State Board of Medicine (Board), is hereby reversed. The case is remanded to this Board with instruction to issue Sandra S. Cary a behavioral specialist license.

Jurisdiction relinquished.

_____
PATRICIA A. McCULLOUGH, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Sandra S. Cary,                                    :
                          Petitioner                :
                                                   :
          v.                                        :     No. 2581 C.D. 2015
                                                   :     Argued: November 16, 2016
Bureau of Professional and                          :
Occupational Affairs, State Board                   :
of Medicine,                                        :
                          Respondent                :

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
          HONORABLE RENÉE COHN JUBELIRER, Judge
          HONORABLE ROBERT SIMPSON, Judge
          HONORABLE P. KEVIN BROBSON, Judge
          HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE MICHAEL H. WOJCIK, Judge
          HONORABLE JOSEPH M. COSGROVE, Judge

**DISSENTING OPINION**
**BY JUDGE BROBSON**                    **FILED: January 31, 2017**

I agree with the majority's analysis, but not its remedy. Specifically, I would vacate the Bureau of Professional and Occupational Affairs, State Board of Medicine's (Board) decision, because the Board arbitrarily looked for accreditations from two accrediting bodies in order to determine whether an educational institution could be approved by the Board under Section 635.2(g)(2)(ii) of The Insurance Company Law of 1921 (Insurance Law).[1] The majority does not strike this provision from the law. The General Assembly's intent in this provision of the law, however, is very clear. One cannot obtain a

---

[1] Act of May 17, 1921, P.L. 682, added by the Act of July 9, 2008, P.L. 885, 40 P.S. § 764h(g)(2)(ii).

license as a behavioral health specialist without a graduate degree from a "Board-approved, accredited college or university." So long as this law remains on the books, it would be unlawful for the Board to issue a license to an applicant unless and until the institution that issued the applicant's advanced degree is both "accredited" and "Board-approved."

The majority opinion reverses the Board's decision, appropriately taking the Board to task for failing to engage in a fulsome and appropriate evaluation of Emmanuel Baptist University as an institution and Cary's course of study there, when determining whether the Board should approve the institution and accept Cary's degree. (Maj. Op. at 14.) Rather than remanding to the Board to conduct this analysis, the majority essentially excuses the Board from doing that which the General Assembly required by directing that the Board on remand simply issue the license. Today, there is still no proper adjudication by the Board as to whether Emmanuel Baptist University was, at the time it issued Cary's degree, an institution that the Board can or should approve. This Court should not direct an executive branch agency to issue a license to anyone who does not satisfy the statutory standards established by the General Assembly, unless, of course, the Court declares the relevant standard unlawful and unenforceable. Because the majority's remedy in this matter amounts to a tacit approval of Emmanuel Baptist University under Section 635.2(g)(2)(ii) of the Insurance Law without any supporting record evidence, factual findings, or legal analysis, I must respectfully dissent.

_____

P. KEVIN BROBSON, Judge

Judge Wojcik joins in this dissenting opinion.

PKB-2