IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Kayla Earley, | : | |
| Petitioner | : | |
| | : | No. 402 M.D. 2017 |
| v. | : | |
| | : | Submitted: December 22, 2017 |
| Barry R. Smith, In his capacity as | : | |
| Superintendent of The State | : | |
| Correctional Institute at Houtzdale, | : | |
| Respondent | : | |

BEFORE:   HONORABLE P. KEVIN BROBSON, Judge
HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


*OPINION NOT REPORTED*

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                                    FILED:  April 16, 2018


Before the Court in our original jurisdiction is the preliminary objection in the nature of a demurrer filed by Barry R. Smith, in his official capacity as Superintendent of the State Correctional Institution at Houtzdale (Superintendent), to the petition for review (Petition) filed by Kayla Earley (Petitioner).  We sustain the objection and dismiss the Petition without prejudice.

Petitioner is the wife of Michael Earley (Earley), an inmate at the State Correctional Institution at Houtzdale (SCI-Houtzdale).  On September 11, 2017, she filed the Petition, seeking a writ of mandamus directing the Superintendent to permit her to visit Earley at SCI-Houtzdale.  Although the factual allegations in the Petition lack specificity and detail regarding matters essential to Petitioner's claim, we accept

the following averments as true for purposes of ruling on the present preliminary objection. *See Barndt v. Department of Corrections*, 902 A.2d 589, 592 (Pa. Cmwlth. 2006).

On January 2, 2017, Petitioner went to see Earley at SCI-Houtzdale and, ostensibly, she was able to meet with him in person. "At some point," though, "the visit was terminated" by correctional officers, Earley "was taken for a search," and, apparently, Petitioner was searched as well. (Petition, ¶¶9-10.) The correctional officers conducted the search(es) based upon an "allegation" that Petitioner had smuggled contraband into the prison, either on January 2, 2017, or sometime prior to that date—the Petition does not specify which—and gave it to Earley. (Petition, ¶10.) However, during the search, the correctional officers did not find contraband, controlled substances, or any other prohibited materials on Petitioner or Earley, and "Petitioner was removed from the prison." (Petition, ¶9.) By letters dated January 9, January 18, and February 3, 2017, the Superintendent suspended Petitioner's visiting privileges, "despite no evidence of any wrongdoing on the part of [Petitioner]." (Petition, ¶14.) The Superintendent informed "the entirety of the Department of Corrections [(Department)] that Petitioner did smuggle in contraband, controlled substances, or other illegal materials," but this assertion was "demonstrably false." (Petition, ¶16.) In the February 3, 2017 letter, the Superintendent denied reconsideration and upheld the suspension of Petitioner's visiting privileges, determining that "Petitioner was an individual that posed a threat to the safety and security of a department facility." (Petition, ¶15.)

On October 4, 2017, the Superintendent filed a preliminary objection to the Petition, contending that Petitioner failed to state a claim for mandamus. The Superintendent argues that Petitioner lacks a clear right to relief, constitutional or

2

otherwise, and posits that he "does not have an absolute ministerial duty to permit a spouse suspected of threatening the security of the institution to visit an inmate." (Preliminary Objections, ¶18.) Petitioner filed an answer on October 16, 2017, maintaining that the Department violated its administrative policies and infringed upon her constitutional rights. In due course, both parties submitted briefs in support of their respective positions.

Under Pennsylvania law, a writ of mandamus is an extraordinary remedy used to compel official performance of a ministerial act or mandatory duty when a petitioner establishes a clear legal right, the respondent has a corresponding duty, and the petitioner has no other adequate remedy at law. *Fagan v. Smith*, 41 A.3d 816, 818 (Pa. 2012). However, a writ of mandamus is not a vehicle through which a petitioner can interfere with a public official's exercise of discretion, and the writ cannot direct a public official to exercise discretion in a particular way. *Sinkiewicz v. Susquehanna County Board of Commissioners*, 131 A.3d 541, 546 (Pa. Cmwlth. 2015); *Clark v. Beard*, 918 A.2d 155, 159 (Pa. Cmwlth. 2007).

As a matter of constitutional law, if "the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause[1] does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Kentucky Department of Corrections v. Thompson*, 490 U.S. 454, 460-61 (1989) (citations omitted). "The denial of prison access to a particular visitor is well within the terms of confinement ordinarily contemplated by a prison sentence, and therefore is not independently protected by the Due Process Clause." *Id.* at 461 (citations and

---

[1] U.S. Const. amend. XIV, §1.

internal quotation marks omitted).[2]  Consequently, if there is a constitutional right to visitation, it must emanate from some other provision of the charter.

The United States Supreme Court has held that a prisoner does not retain those constitutional rights that are incompatible with incarceration or inconsistent with the legitimate penological objectives of the corrections system.  *Johnson v. California,* 543 U.S. 499, 510 (2005); *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003).  The First Amendment guarantee of "freedom of association is among the rights least compatible with incarceration" and, as such, "some curtailment of that freedom must be expected in the prison context."  *Overton*, 539 U.S. at 131.  Generally, a prison regulation restricting visitation rights will be upheld against constitutional challenges, including the First Amendment, if the regulation bears a rational relationship to a legitimate penological interest.  *Id.* at 132;[3] *see Johnson,* 543 U.S. at 510.   In making this

_____

[2] Notably, a majority of the United States Supreme Court Justices in *Thompson* concluded that a prisoner does not have a liberty interest entitled to the protections of due process despite the dissenters' observation that the court's decision essentially vested prison officials with "unbridled governmental power" to "deny prisoners visits from . . . spouses . . . for any reason whatsoever, or for no reason at all." *Thompson*, 490 U.S. at 465-66 (Marshall, J., dissenting, joined by Brennan and Stevens, JJ.).

[3] In *Overton*, the United States Supreme Court addressed the constitutionality of a state regulation stating that inmates who are classified as the highest security risks, as determined by prison officials, are limited to noncontact visitation; that is, the inmates must communicate with their visitors through a glass panel and are not allowed physical contact with their visitors in a visitation room.  In concluding that the regulation did not run afoul of the First Amendment right of association, the Court said:

> We do not hold, and we do not imply, that any right to intimate association is altogether terminated by incarceration or is always irrelevant to claims made by prisoners. We need not attempt to explore or define the asserted right of association at any length or determine the extent to which it survives incarceration because the challenged regulations bear a rational relation to legitimate penological interests. This suffices to sustain the regulation in question.

determination, courts must accord substantial deference to the professional judgment and discretion of prison administrators, "who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton*, 539 U.S. at 132; *see Block v. Rutherford*, 468 U.S. 576, 586-89 (1984); *Bronson v. Central Office Review Committee*, 721 A.2d 357, 358 (Pa. 1998).

The reason for such deference is straightforward. As aptly explained by one court, the penal environment "is a unique institution fraught with sensitive security hazards, not the least of these being smuggling of contraband such as drugs, money, knives, etc. The state has a high security interest in eliminating smuggling into and out of penitentiaries." *Gettleman v. Werner*, 377 F. Supp. 445, 451 (W.D. Pa. 1974); *see Bell v. Wolfish*, 441 U.S. 520, 558-60 (1979). "In this respect, prison guards must have discretion to act quickly and decisively, and other reasonable procedures in everyday disciplinary problems should not be employed to handcuff prison guards in following the orders and directives designed to eliminate smuggling." *Werner*, 377 F. Supp. at 451; *see Commonwealth v. Dugger*, 486 A.2d 382, 384 (Pa. 1985).

The relevant administrative policy of the Department, contained in DC-ADM 812, provides: "Any visitor's privileges may be limited, suspended, or restricted (such as non-contact visits only or a restriction on visiting at more than one facility) if information becomes available suggesting that allowing the individual to visit poses a threat to the safety and security of any Department facility." DC-ADM 812, §1.B.8 (Security Policy). Notably, the Policy is tempered by disclaimer language stating that "[t]his policy does not create rights in any person." *Id.* at VI (Rights Under this Policy). In two unreported decisions, *Hill v. Department of Corrections*, (Pa. Cmwlth., No. 419

---

539 U.S. at 131-32.

M.D. 2012, filed April 9, 2013) (unreported), and *Pfender v. Department of Corrections*, (Pa. Cmwlth., No. 168 M.D. 2009, filed September 23, 2009) (unreported) (*Pfender I*), this Court dismissed mandamus petitions filed by the wife of a prisoner[4] alleging that the suspension of her visitation rights for security reasons violated her constitutional rights. In both cases, we concluded that the wife did not possess a constitutional right to visitation, relying on *Flanagan v. Shively*, 783 F. Supp. 922, 934 (M.D. Pa.), *aff'd* 980 F.2d 722 (3d Cir. 1992); *Chem v. Horn*, 725 A.2d 226, 229 n.2 (Pa. Cmwlth. 1999); and *Feigley v. Jeffes*, 522 A.2d 179, 183 (Pa. Cmwlth. 1987).[5] In

---

[4] Although she changed her name, the wife was the same individual in *Hill* and *Pfender I*. *See Pfender I*, slip op. at 1 n.1.

[5] As a federal district court in Pennsylvania stated: "Inmates have no constitutional right to visitation. Visitation is a privilege subject to revocation at the discretion of the Warden when necessary to ensure security and maintain order in the institution." *Flanagan*, 783 F. Supp. at 934. "Prison authorities have discretion to curtail or deny visitation if they deem appropriate, and no due process right is implicated in the exercise of that discretion." *Id.* In *Chem*, this Court followed the holding in *Thompson* and concluded that, for purposes of procedural due process, an inmate does not have "a protected liberty interest in visiting privileges." 725 A.2d at 229 n.2.

In *Feigley*, an inmate sought an order compelling prison officials to permit him to receive visits from his religious advisor. In dismissing the claim, this Court relied on department regulations stating that prison officials can terminate or forbid a visit when the visit constitutes a "threat to the security and order of the institution." 522 A.2d at 183 (citation omitted). Even though there was no evidence in the opinion to indicate that the religious advisor presented such a threat, we determined that a writ of mandamus was improper because the writ could not compel the prison officials to perform a discretionary act.

Adhering to this (or a substantially similar) rationale, courts have consistently concluded, post *Overton*, that there is no inherent right to visitation under any provision of the constitution. *See Dunn v. Castro*, 621 F.3d 1196, 1202-03 & n.4 (9th Cir. 2010) (collecting cases); *Neumeyer v. Beard*, 301 F. Supp. 2d 349, 351 (M.D. Pa. 2004) ("[I]t is well-settled that there is not a constitutional right to visitation for convicted prisoners, their family and spouses."). Even in those cases where it was assumed that such a right is embodied in the First Amendment (to at least some extent), the courts have concluded that a regulation restricting visitation will withstand constitutional scrutiny if it has a reasonable relationship to a legitimate penological interest. *See, e.g.*, *Stojanovic v. Humphreys*, 309

so determining, we emphasized that the Department is vested with broad discretion over security matters and possessed the authority to suspend visitation rights when it determines that a visitor poses a security risk. *See also Pfender v. Secretary of Pennsylvania Department of Corrections*, 443 Fed. Appx. 749, 752-53 (3d Cir. 2011) (unreported) (*Pfender II*). In *Pfender I*, this Court also rejected the wife's argument that she was denied due process of law because she was not afforded an administrative hearing upon which to contest her designation as a security risk, noting that neither the constitution nor state law conferred her with such a right. *See also Robles v. Pennsylvania Department of Corrections*, 718 A.2d 882, 883-84 (Pa. Cmwlth. 1998). For these reasons, we concluded in *Hill* and *Pfender I* that the wife did not have a clear legal right to restoration of her suspended visiting privileges and, therefore, mandamus was inappropriate.

Unfortunately for Petitioner, the same result must obtain here. Assuming, *arguendo*, that Petitioner is deserving of some protection under the First Amendment, any right in this regard is necessarily circumscribed by the need to afford deference to prison officials in the exercise of their professional judgment when pursuing legitimate penological interests. *See Overton*, 539 U.S. at 131-32. "That there is a valid, rational connection between a ban on contact visits and internal security of a detention facility is too obvious to warrant extended discussion." *Block*, 468 U.S. at 586.

Nonetheless, throughout the Petition, Petitioner adamantly avers that the underlying "allegation" and the Superintendent's decision was, in fact, unfounded and "demonstrably false." (Petition, ¶16.) However, her "denial of culpability does not create a triable issue on the question of whether the suspension of her visiting privileges bears a rational relationship to legitimate penological interests." *Pfender II*, 443 F.

---

F. App'x 48, 50-51 (7th Cir. 2009) (unreported); *Wirsching v. Colorado*, 360 F.3d 1191 (10th Cir. 2004); *King v. Frank*, 328 F. Supp. 2d 940, 945-946 (W.D. Wis. 2004).

App'x at 753. The only other relevant averments in the Petition regarding the Department's penological goal pertain to Petitioner's express suggestion that she did not violate any of the Department's written policies. (Petition, ¶¶14, 16.) But, as we have said before, "this statement is not a well-pleaded fact; rather, it is a conclusion of law that need not be accepted as true for purposes of preliminary objections." *Richardson v. Wetzel*, 74 A.3d 353, 358 (Pa. Cmwlth. 2013). Importantly, the burden is not upon the Department or Superintendent to prove the constitutionality of a prison regulation; instead, it rests upon the prisoner to prove its unconstitutionality. *Garber v. Pennsylvania Department of Corrections*, 851 A.2d 222, 227-28 (Pa. Cmwlth. 2004). Quite simply, as the Petition now stands, Petitioner has failed to allege facts sufficient to support a finding that the Security Policy is not reasonably related to its legitimate penological goal of maintaining security. Therefore, her request for a writ of mandamus on First Amendment grounds fails as a matter of law.

Moreover, as explained above, Petitioner has not been deprived of a protected liberty or property interest that would entitle her to the safeguards of procedural due process. *See Thompson*, 490 U.S. at 461; *supra* n.5; *see also Shore v. Department of Correction*s, 168 A.3d 374, 383 (Pa. Cmwlth. 2017). Regardless, as conceded in the Petition, Petitioner received written notice of the basis for the suspension; she submitted her complaint to the Superintendent; and the Superintendent formally resolved it by written correspondence. As such, even if Petitioner was deserving of some form of process, she "was provided all the process that she might have been due under the circumstances," *Pfender II*, 443 Fed. App'x. at 753 n.3, and there is no legal foundation for mandamus on procedural due process grounds. *See Robles*, 718 A.2d at 883-84; *Pfender I*, slip op. at 6; *see also Shore*, 168 A.3d at 380-82. This proposition remains true, even though Petitioner asserts that the "allegation"

8

supporting the Superintendent's decision was unreliable and/or unfounded. *See Nifas v. Wetzel*, (Pa. Cmwlth., No. 1736 C.D. 2014, filed June 5, 2015) (unreported), slip op. at 12; *see also Sprouse v. Babcock*, 870 F.2d 450, 452 (8th Cir. 1989). Likewise, the Superintendent's decision to suspend Petitioner's visitation privileges does not contravene the procedural due process rights of Petitioner.[6]

Relatedly, to the extent Petitioner asserts that, as a factual matter, the Superintendent's decision violated the terms of the Department's policies regarding visitation, these allegations are insufficient to state a claim for mandamus. *See Tindell v. Department of Corrections*, 87 A.3d 1029, 1035 (Pa. Cmwlth. 2014). This is because the internal policies of the Department do not create a vested or enforceable right in inmates—or anyone else for that matter—and prison officials must be afforded a wide range of discretion in enforcing their policies. *Id.* Our Supreme Court has held that "internal prison operations are more properly left to the legislative and executive branches [and] prison officials must be allowed to exercise their judgment in the execution of policies necessary to preserve order and maintain security free from judicial interference." *Bronson*, 721 A.2d at 358. Therefore, insofar as the Petition seeks a writ of mandamus for alleged violations of the Department's policies, Petitioner has failed to state a claim upon which relief can be granted. *See Shore*, 168 A.3d at 386.

Petitioner further contends that her mandamus claim is cognizable on what appears to be a substantive due process-type theory, contending that the Superintendent's decision to suspend her visiting privileges was arbitrary. Specifically, Petitioner asserts that proof that a violation of the Department's policy

---

[6] Petitioner does not state in the Petition how long her visiting privileges were suspended. Assuming that they were suspended indefinitely, Petitioner may request reinstatement after two years. DC-ADM 812, §3.B.3(c).

had occurred "requires more than mere suspicion" and "no evidence exists" that she engaged in "any wrongdoing." (Petitioner's brief at 2, 10-11.)

For support, Petitioner cites section 1.N.5 of DC-ADM 812 (Drug Policy), which imposes a permanent ban on visiting any Department facility when a visitor attempts to bring or brings drugs on the property of a correctional facility. *See id.* ("Any visitor, including immediate family members of the inmate, who attempt to bring or who brings drugs upon the grounds of any Department facility will be permanently banned from visiting at all Department facilities and the matter shall be referred to the Pennsylvania State Police for prosecution."). In doing so, Petitioner overlooks the Security Policy and mistakenly believes that the Superintendent could only suspend her visiting privileges under the Drug Policy.

However, as alleged in the Petition, the Superintendent upheld the suspension of Petitioner's visiting privileges on February 3, 2017, because "Petitioner was an individual that posed a threat to the safety and security of a department facility." (Petition, ¶15.) Accepting this averment as true, as the Court must, it establishes that the Security Policy is indeed applicable. This conclusion is bolstered by the fact that Petitioner has also not alleged that she suffered the peculiar and unique consequence of a permanent ban that is associated with the Drug Policy. In *Pfender I*, this Court reached a similar conclusion when we determined that, even if two policies of the Department were implicated by the fact that the wife brought contraband into the facility, the Security Policy was nonetheless "salient" and a basis upon which the Department could suspend visiting privileges. Slip op. at 4, n.3.

To state a cause of action under the substantive component of the Due Process Clause, Petitioner must show that the Superintendent engaged in conduct that "shocks the conscience" in "a constitutional sense." *County of Sacramento v. Lewis*,

523 U.S. 833, 846 (1998); *see Zinermon v. Burch*, 494 U.S. 113, 125 (1990). Generally speaking, the principles of substantive due process prevent government action that "is legally irrational in that it is not sufficiently keyed to any legitimate state interests," *Committee of United States Citizens in Nicaragua v. Reagan*, 859 F.2d 929, 943 (D.C. Cir. 1988) (citations and internal quotation marks omitted), or, in other words, is "truly irrational." *Bituminous Materials, Inc. v. Rice County, Minnesota*, 126 F.3d 1068, 1070 (8th Cir. 1997); *see Foucha v. Louisiana*, 504 U.S. 71, 80 (1992).

At the same time, although mandamus is generally available to "review the exercise of the actor's discretion where it is arbitrary," *County of Allegheny v. Commonwealth of Pennsylvania*, 490 A.2d 402, 408 (Pa. 1985), it is not the province of the judiciary to substitute its judgment for that of the administrative official charged with determining "a certain fact." *Citizens Committee to Recall Rizzo v. Board of Elections of the City and County of Philadelphia*, 367 A.2d 232, 237-38 (Pa. 1976). "Our precedent states as a rule that administrative action is arbitrary and capricious where it is unsupportable on any rational basis because there is no evidence upon which the action may be logically based." *Cary v. Bureau of Professional and Occupational Affairs, State Board of Medicine*, 153 A.3d 1205, 1210 (Pa. Cmwlth. 2017) (en banc) (citation omitted). As recognized by this Court, the United States Supreme Court has stated that, in order for an agency to render a decision that is not arbitrary and capricious,

> the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. In reviewing that explanation, [the court] must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment . . . .

11

*Cary*, 153 A.3d at 1210 (quoting *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983)).

According to its plain language, the Security Policy states that the Department need only have information "suggesting" that there is a "threat to the safety and security" of the prison in order to suspend visiting privileges. By its very nature, and contrary to Petitioner's assertion, this standard involves a quantum of "suspicion" and necessitates a discretionary judgment call as to when a "threat" is plausible. Just as "[a] prison setting involves unique concerns and security risks, thereby necessitating more leeway in allowing searches than might be found in a non-penal environment," *Dugger*, 486 A.2d at 384, there must be a relaxed, deferential standard upon which prison officials can assess whether the information adequately "suggests" that there is a risk to prison security. *See Abu-Jamal v. Price*, 154 F.3d 128, 136 (3d Cir. 1998).[7]

Here, the facts as alleged by Petitioner indicate that the Department had obtained information in the form of an "allegation" that she smuggled (or previously smuggled) drugs or other contraband into SCI-Houtzdale. Consistent with our analysis above, any issues surrounding the veracity of or articulable justification for the "allegation" are matters to be considered and resolved by the Superintendent on a discretionary basis in determining whether there is a "threat" to the safety and/or security of the institution. *See Young v. Vaughn*, (E.D. Pa., No. 98-4630, filed July 31, 2000) (unreported), slip op. at ___, 2000 U.S. Dist. LEXIS 10667 at *7 ("Visitors are a security risk, and deference should be given to prison officials' visitation decisions.").

---

[7] Tellingly, there is nothing in the Security Policy that requires there to be "evidence" that the risk had actually occurred or materialized as a predicate to suspending visitation privileges. Nor does the Security Policy mandate that the Department possess "evidence" establishing that the Petitioner engaged, or attempted to engage, in prohibited activity beyond a reasonable doubt. Obviously, Petitioner is not being prosecuted for committing a crime. Therefore, the concrete evidence that Petitioner apparently envisions is needed to suspend her visiting privileges (*e.g.*, video surveillance, being caught "red-handed") is simply not necessary under the Security Policy.

Importantly, Pennsylvania law presumes that the Superintendent acted lawfully and exercised his discretion in good faith and in a rational matter, until facts demonstrating the contrary are averred. *See Office of Governor v. Donahue*, 98 A.3d 1223, 1239 (Pa. 2014); *see also Shaw v. Murphy*, 532 U.S. 223, 232 (2001). The Petition does not allege any facts to overcome this presumption, and, on this note, Petitioner's admitted existence of the "allegation" appears to constitute "some basis" for the Superintendent's decision to suspend her visiting privileges. Consequently, we can neither infer nor conclude that the Superintendent's decision was "truly irrational" or "shocks the conscience" for purposes of substantive due process, or was so arbitrary that it evidenced a complete failure to exercise discretion for purposes of a writ of mandamus. *See Steinbach v. Branson*, (D.N.D. 2007, No. 1:05-CV-101, filed October 9, 2007) (unreported), slip op. at __, 2007 U.S. Dist. LEXIS 75156, at **17, 56-57 (dismissing an inmate's constitutional claims based on the denial of visitation privileges despite voicing serious concerns "with respect to whether the results of the IONSCAN screening can rationally be used . . . to support the proffered justification for the denial of visitation");[8] *Brown v. Wetzel*, (Pa. Cmwlth., No. 318 M.D. 2015, filed

---

[8] In *Steinbach*, a civil rights case, the visitor-girlfriend sent three letters to an inmate, which under "sketchy" circumstances, tested positive at the prison facility on an IONSCAN for trace elements of a controlled substance. The police later conducted an investigation and the results were negative, or at least inconclusive, on one of the letters, while indicating that the contraband allegedly detected by the IONSCAN was located under lipstick marks on the outside of the envelope. The prison officials did not forward the other two letters to the police for forensic testing, and ultimately rescinded the visitor's contact and non-contact visitation privileges for a total of three years. During this time, the visitor denied any attempt to introduce drugs into the facility and she offered several possible explanations for the positive screening results, including claims that the alerts may have been caused by the chemical composition of the "kisses" placed on the envelopes, which she sprayed with perfume, and/or the prescription pain medication she was taking. The visitor also offered to submit to a polygraph test conducted by prison officials, which was declined, and the inmate asserted that he is not a drug user or dealer, has never tested positive for drugs, and has never been disciplined for drug use or possession of contraband. In rebuttal, the prison officials "proffered virtually no evidence

13

September 9, 2016) (unreported), *aff'd*, __ A.3d __ (Pa., No. 125 MAP 2016, filed January 18, 2018), slip op. at 6 (concluding that an inmate could not utilize mandamus to challenge the Department's confiscation of records he obtained from the Department of Environmental Protection "relating to air, water and waste water monitoring of infrastructure at two state correctional facilities" because the decision to designate items as contraband "clearly relates to an internal security matter within the discretion of [the Department]").[9]  Therefore, Petitioner has failed to state a claim for mandamus on an arbitrariness and/or substantive due process theory.

---

regarding how the IONSCAN detected the substances that were alleged to be found,"  merely proved that "the IONSCAN is capable only of screening items for the presence of contraband down to one-trillionth of a gram and is not capable of further discrimination," and "offered no evidence regarding the amounts allegedly detected in the correspondence, much less what amount is considered significant."  2007 U.S. Dist. LEXIS 75156, at *12 & n.5.

While emphasizing that there may be genuine issues of material fact with respect to the inmate's constitutional claims, and detailing what it perceived to be a split of authority in the case law, the federal district court granted summary judgment in favor of the prison officials concluding that the claims lacked merit under prevailing circuit precedent.  In the alternative, the federal district court granted summary judgment on the basis of qualified immunity, finding that the officials did not violate clearly established law.

[9] *See also Young v. City of St. Charles*, 244 F.3d 623, 626 (8th Cir. 2001) ("Although Young's allegations that the evidentiary rulings and procedures employed by the defendants, if true as pleaded in his complaint, may appear arbitrary, capricious or even contrary to [state] law and [administrative] rules, they are insufficient to establish conduct that is 'truly irrational' or 'shocking to the conscience' necessary to state a claim for a denial of substantive due process under the Fourteenth Amendment."); *cf. Horan v. Newingham*, (Pa. Cmwlth., No. 2622 C.D. 2015, filed October 24, 2016) (unreported), slip op. at 10 (stating that a misconduct report containing hearsay, even if disputed by the inmate and supported by no other evidence, constitutes the "some evidence" necessary to support a prison disciplinary determination and suffices to negate a prisoner's claim that he was retaliated against for exercising constitutional rights); *Tindell*, 87 A.3d at 1035 ("The petition in the nature of mandamus filed by Petitioner[] asks this Court to invade the discretion afforded [the Superintendent] and to direct [the Superintendent] to exercise [his] discretion in a particular manner.  Even if this Court were to agree with Petitioner[] that [the Superintendent] exercised [his] discretion incorrectly, a writ of mandamus cannot be issued to compel [the Superintendent] to exercise [his] discretion in a particular way.").

Accordingly, because Petitioner did not allege sufficient facts establishing that she has a clear legal right to relief, the Court sustains the Superintendent's preliminary objection and dismisses the Petition without prejudice.

_____
PATRICIA A. McCULLOUGH, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Kayla Earley,                                    :
                    Petitioner                   :
                                                 :   No.  402 M.D. 2017
            v.                                   :
                                                 :
Barry R. Smith, In his capacity as               :
Superintendent of The State                      :
Correctional Institute at Houtzdale,             :
                    Respondent                   :


# ***ORDER***


AND NOW, this 16th day of April, 2018, the preliminary objection in the nature of a demurrer filed by Barry R. Smith, in his capacity as Superintendent of the State Correctional Institutional at Houtzdale, to the petition for review (Petition) filed by Kayla Earley is hereby sustained, and the Petition is dismissed without prejudice.


                                          _____
                                          PATRICIA A. McCULLOUGH, Judge