## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

IMC Construction,               :
           Petitioner       :
                               :
         v.                  :
                               :
The Port of Philadelphia a/k/a   :
PhilaPort,                :   No. 516 C.D. 2020
           Respondent    :   Argued: November 9, 2020


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE ANNE E. COVEY, Judge (P.)
                HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                               FILED: December 4, 2020

IMC Construction (IMC) petitions this Court for review of The Port of Philadelphia a/k/a PhilaPort's (PhilaPort)[1] May 19, 2020 Final Determination denying IMC's bid protest (Protest) relating to PhilaPort's rejection of IMC's bid on PhilaPort Project No. 20-028.1 - Construction of PhilaPort Distribution Center New Dry Warehouse (Project). The issue before this Court is whether PhilaPort erred by denying IMC's Protest on the basis that IMC's bid was non-responsive.[2] Upon review, we affirm.

---

[1] PhilaPort was formerly known as the Philadelphia Regional Port Authority. PhilaPort was established pursuant to Section 4 of the Philadelphia Regional Port Authority Act (Act), Act of July 10, 1989, P.L. 291, 55 P.S. § 697.4. It is "a public authority and instrumentality of the Commonwealth[, which] shall exercise the powers of the Commonwealth as an agency of the Commonwealth." *Id.*

[2] IMC raises three issues in its Statement of the Questions Involved: (1) whether PhilaPort erred by denying IMC's Protest because its bid was non-responsive; (2) whether PhilaPort's rejection of IMC's bid was arbitrary and capricious and/or an abuse of discretion; and (3) whether, in the alternative, PhilaPort's rejection of IMC's bid was exclusionary, anti-competitive, and contrary to law and, therefore, if awarded to any company other than IMC, the contract for the Project (Contract)

## Background

On January 3, 2020, PhilaPort issued an invitation for bids (IFB) for the Project, then identified as PhilaPort Project No. 19-131.1 (Project No. 19-131.1 IFB).[3] However, on February 21, 2020, PhilaPort cancelled Project No. 19-131.1 IFB.[4] Thereafter, PhilaPort issued a new IFB for the Project, which is the subject of this appeal.[5]

"The [IFB's] Bidding Documents consist[ed] of the . . . Instructions to Bidders, the Bid Form, . . . submissions related to PhilaPort's Diversity Inclusion Policy and Plan [(Diversity Plan)], . . . and forms and submittals required by the . . . Bidding or Contract Documents to be submitted with the Bid." *See* Reproduced Record (R.R.) at 8a; *see also* R.R. at 1a-239a. The General Conditions of PhilaPort Construction Contracts (General Conditions) contained the terms of the proposed Contract between PhilaPort and the successful bidder.[6] *See* R.R. at 138a-208a.

---

would be void as a matter of law. *See* IMC Br. at 4. Because these issues are subsumed in whether PhilaPort erred by denying IMC's Protest because it was non-responsive, they will be addressed therein.

[3] IMC claims that it was the lowest responsive and responsible bidder on Project No. 19-131.1 IFB. *See* IMC Br. at 7.

[4] According to IMC: "Subsequent to PhilaPort's final determination of IMC's [Protest], PhilaPort disclosed, in a belated response to [a] [R]ight-to-[K]now [Law, Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101-67.3104,] request submitted by IMC, that it had rejected all bids on Project No. 19-131.1 [IFB] because of, *inter alia*, bid irregularities relating to self-performance and diversity requirements." IMC Br. at 8 n.1 (italics added).

[5] The parties represent that PhilaPort posted/reissued the IFB for the Project on March 16, 2020. *See* IMC Br. at 8 and Ex. A (Final Det.) at 1; *see also* PhilaPort Br. at 5. However, the IFB could not have been posted/reissued on March 16, 2020, since that was the date the Mandatory Pre-Bid Meeting was scheduled to be conducted. *See* Reproduced Record (R.R.) at 1a. Moreover, PhilaPort issued Addendum No. 1 on March 12, 2020 (cancelling the March 16, 2020 Mandatory Pre-Bid Meeting because of the COVID-19 pandemic). *See* R.R. at 240a. Thus, the IFB had to have been posted/reissued *before* March 12, 2020. It is not clear in this record on what date the Project was actually posted/reissued.

[6] The Instructions to Bidders were included in IFB Part 1. *See* R.R. at 4a-50a. The Bid Form was included in IFB Part 2. *See* R.R. at 52a-66a. IFB Part 3 included the General Conditions. *See* R.R. at 138a-208a. IFB Part 3 also contained PhilaPort's Diversity Plan, which included the 20% minimum participation levels applicable to the Project. *See* R.R. at 213a-238a.

Section II.E.2 of the General Conditions (Subcontracts) specified: "The Contractor shall perform at least twenty percent (20%) of the total amount of the Work with the Contractor's own organization based upon the Contract Sum." R.R. at 149a. Section II.A.vii of the Bid Form (Bidder Responsiveness Section) also contained the following bidder certification: "That the [b]idder shall perform on the site and with [its] own organization at least 20[%] of the total amount of Work to be performed under this [C]ontract." R.R. at 57a. Section 1 of the Instructions to Bidders (Work to be Performed) stated: "The Work to be performed is described in the Contract Documents . . . ." R.R. at 8a. "Work" was defined in Section I.A of the General Conditions (Definitions) as "the subject matter of the Contract, i.e., the labor or service to be performed and/or the material and/or equipment to be supplied, delivered and/or installed . . . ." R.R. at 147a; *see also* R.R. at 147a-155a.

In addition, Section 29 of the Instructions to Bidders (Diversity Plan) specified that "[b]idders must comply with the requirements of the [Diversity] Plan to be eligible for the award of the Contract[.]"[7] R.R. at 32a-33a. Section II of the Diversity Plan (Policy Statement) reflected:

> It is the policy of [PhilaPort] to promote opportunities for full participation by Minority-owned [business enterprises (MBEs)], Women-owned [business enterprises (WBEs)], Veteran-owned or Service-Disabled-Veteran-owned and [Lesbian, Gay, Bisexual or Transgender (]LGBT[)]-owned small businesses, hereafter collectively referred to as disadvantaged business enterprises [(DBEs) or Historically Underutilized Business Enterprises (]HUBs[)] in all project[-]related construction contracts to the greatest extent feasible and to do so by insuring that all Prime Contractors do not discriminate in the solicitation, award and administration of construction subcontracts on [PhilaPort's] projects.

---

[7] PhilaPort's Diversity Plan was included in IFB Part 3. *See* R.R. at 213a-238a.

R.R. at 215a; *see also* R.R. at 216a. Section V.A of the Diversity Plan stated:

> [PhilaPort] will establish minimum participation levels (MPLs) for the HUBs on a project-by-project basis. The MPLs will be established for each prime bid to be used solely as a guide in determining Prime Bidder responsibility. MPLs are applied to each bid category. The MPLs will vary based on the market availability of subcontracting opportunities for HUB's, on a project-by-project basis.

R.R. at 219a. Section VI.B.1.a of the Diversity Plan (Participation Level) further required:

> All contracts awarded for construction will have a minimum HUB participation level set by the Director of Procurement, but in no event shall it be less than 20% of the contract value. The participation for each award must include at least 2 of the categories that are identified as HUB with no less than 5% participation for every category being included.

R.R. at 222a (emphasis omitted). Accordingly, bidders are mandated to include DBE Solicitation and Commitment Statements with their bids showing their efforts to solicit HUB contractors, and written confirmations of the intent to use the identified contractors if awarded the Contract.[8] *See* R.R. at 219a, 225a, 229a-234a.

Between March 12 and April 17, 2020, PhilaPort issued seven addenda to the IFB.[9] IMC acknowledged its receipt of the IFB Addenda. *See* R.R. at 729a-735a.

_____

[8] Section II.A.vi of the Bid Form (Bidder Responsiveness Section) contained the following bidder certification: "[T]he information provided in connection with PhilaPort's [Diversity Plan] Form[] is accurate and the mandatory information on [the] form is filled out completely." R.R. at 57a.

[9] Section 4.A of the Instructions to Bidders declared: "All written requests ('Requests for Interpretation') related to the proposed Work or proposed Contract Documents must be received by the Director of Procurement at the offices of PhilaPort, no later than close of business ten (10) calendar days prior to the Bid Opening Date." R.R. at 11a (emphasis omitted). Section 4.C of the Instructions to Bidders (Interpretation of Contract Documents) stated:

> PhilaPort's response to any Request for Interpretation will be in the form of a written [a]ddendum . . . signed by PhilaPort. PhilaPort will post all [a]ddenda . . . to its website at www.philaport.com and it shall be the responsibility of the [b]idder to check for updates. The [b]idder

Addendum No. 2 reflected:

> Q3: As the Project is materially the same as Project 19-131.1, . . . is it the intent of PhilaPort to re-issue the [Project] 19-131.1 [IFB] Questions and Answers as an addendum to [this Project IFB], or do the bidders need to ask each question again under the [Project's] solicitation, and PhilaPort will answer each question again?
>
> [A3:] The questions and responses from [the] Project 19-131.1 [IFB] are attached to this addendum . . . .

R.R. at 242a (emphasis omitted). PhilaPort issued a similar response in Addendum No. 6:

> Q2: As the Project is materially the same as Project 19-131.1, which was cancelled after bids were opened, is it the intent of PhilaPort to re-issue the [Project] 19-131.1 [IFB] Questions and Answers as an addendum to [the current Project IFB], or do the bidders need to ask each question again under the [Project] 20-028.1 [IFB], and PhilaPort will answer each question again?
>
> A2: See Addendum [No.] 2 attachments which include the responses from [the Project] 19-131.1 [IFB] . . . .

R.R. at 358a (emphasis omitted). Addendum No. 2 for the current IFB expressly incorporated the following inquiry from Project No. 19-131.1 IFB Addendum No. 2 relevant to self-performance of Work:

> Q1[:] Page 5 of the [General Conditions,] Item II.E.2 states that the contractor is to perform 20% of the work with [its] own forces. Please note that most general contractors in the

---

is responsible for all [a]ddenda . . . issued, whether or not reviewed. All addenda . . . become a part of the Contract Documents, and all [b]idders are bound by their provisions.

R.R. at 12a.

PhilaPort issued Addendum No. 1 on March 12, 2020, Addendum No. 2 on March 20, 2020, Addendum No. 3 on March 20, 2020, Addendum No. 4 on March 26, 2020, Addendum No. 5 on April 3, 2020, Addendum No. 6 on April 10, 2020, and Addendum No. 7 on April 16, 2020. *See* R.R. at 240a-419a.

Philadelphia market do not self-perform work and, if they do, they do not perform anywhere near 20%. If in fact this requirement stands, PhilaPort will likely receive a limited amount of bids from site/civil contractors only.

A1[:] This requirement will remain unchanged.

R.R. at 244a.

In addition, Addendum No. 4 incorporated a revised Bid Form (Revised Bid Form), in which Section II.B (Bidder Responsiveness) provided:

> The bidder acknowledges by submission of this bid, that the [b]idder shall perform on the site and with [its] own organization at least twenty percent (20%) of the total amount of Work to be performed under this [C]ontract, exclusive of profit, overhead and the costs of procuring insurance and bonds. The bidder shall submit with his bid a complete description of the [W]ork that will be performed (e.g., earthwork, paving, brickwork, roofing, etc.), the percentage of the total [W]ork this represents, and the estimated dollar value thereof[.]

R.R. at 307a-308a; *see also* R.R. at 298a. Further, in Addendum No. 6, PhilaPort answered the following question:

> Q1: Does the successful Contractor have to perform 20% of the contract? Does this refer to labor - actual trade work? Does it include Project Management and/or purchase of materials? Does it include profit and overhead?
>
> A1: See Bid Form, Section II-Bidder Responsiveness Section[] B[] (revised per Addendum [No.] 4)[.]

R.R. at 358a (emphasis omitted).

Regarding the Diversity Plan, Addendum No. 4 also "incorporated . . . a revised [Diversity Plan] (for Construction) [(Revised Diversity Plan) to reflect federal grant requirements.]"[10] R.R. at 742a; *see also* R.R. at 298a-354a. The Special Instructions for the Revised Diversity Plan stated:

---

[10] The Diversity Plan was revised March 25, 2020. *See* R.R. at 323a-354a.

> *This contract shall have a[n MPL] of 20% of the total contract value.*
>
> *Per federal grant requirements, PhilaPort must accept [DBEs] in an amount of no less than 10% of the total contract value. In addition to the federal requirement of 10%, the remaining 10% diversity participation may utilize any combination of PhilaPort's [HUB] pool of inclusion below:*
>
> . . . .
>
> > • a DBE (*See definition below)
> >
> > • an MBE
> >
> > • a WBE
> >
> > • a Veteran or Service-Disabled Veteran Business Enterprise
> >
> > • an LGBT Business Enterprise
>
> *Definition of a [DBE]:
>
> DBEs are for-profit small business concerns where socially and economically disadvantaged individuals own at least a 51% interest and also control management and daily business operations. African Americans, Hispanics, Native Americans, Asian-Pacific and Subcontinent Asian Americans, and women are presumed to be socially and economically disadvantaged. Other individuals can also qualify as socially and economically disadvantaged on a case-by-case basis.
>
> https://www.transportation.gov/civil-rights/disadvantaged-business-enterprise/definition-disadvantagedbusiness-enterprise[.]

R.R. at 320a (bold emphasis omitted); *see also* R.R. at 331a. Section III.B of the Revised Diversity Plan separately defined DBEs, MBEs, WBEs, Veteran or Service-Disabled Veteran Business Enterprises and LGBT Business Enterprises. *See* R.R. at 325a-329a. Exhibit 1 of the Revised Diversity Plan also included separate HUB Solicitation and Commitment Statements for bidders to complete for *each* HUB type:

DBE, MBE, WBE, Veteran or Service-Disabled Veteran Business Enterprises and LGBT Business Enterprises. *See* R.R. at 340a-344a. In addition, the Revised Diversity Plan proffered an Example of Accepted Diversity Submissions. *See* R.R. at 351a.

Section VI.A.1 of the Revised Diversity Plan (Procedure to Solicit Participation) provided that bidders "will only be given credit for HUBs that are certified or accepted as certified HUBs by programs approved by, and in accordance with additional requirements set forth by, Board[11] resolution." R.R. at 334a. Relative to this IFB, PhilaPort specified:

### ACCEPTED CERTIFICATIONS

**PhilaPort accepts approved third-party certifications from any of the following entities:**

• Unified Certification Program (UCP) []

(Every state has its own [UCP]. This links to the Pennsylvania [UCP].)

• Woman's Business Enterprise National Council (WBENC)

• National Minority Supplier Development Council (NMSDC)

• United States Small Business Administration (SBA) 8(a) Program []

• Vets First Verification Program at vetbiz.gov

• US Business Leadership Network (USBLN)

• National Gay & Lesbian Chamber of Commerce (NGLCC)

R.R. at 322a. The list included hyperlinks to each source. *See* R.R. at 322a.

---

[11] Although "Board" is not defined in this record, Section 3 of the Act defines it as PhilaPort's "governing body." 55 P.S. § 697.3; *see also* Section 5 of the Act, 55 P.S. § 697.5.

Based on the foregoing, the Bid Documents, as amended, required each bidder to demonstrate in its bid that: (1) it would conduct 20% of the Work "on the site and with [its] own organization," R.R. at 57a, 307a; and (2) at least 20% of the total Contract value would include HUB participation, with at least 10% by DBEs certified by one of the third-party entities PhilaPort listed in the Revised Diversity Plan.

On April 17, 2020, PhilaPort opened the following sealed bids for the Project: IMC, $35,953,487.00; Daniel J. Keating Company, $36,980,000.00; Haines & Kibblehouse, Inc., $37,950,000.17; and The Bedwell Company, $45,989,000.00. *See* R.R. at 451a. Despite that IMC was the lowest bidder, "[p]ursuant to the terms of the IFB, PhilaPort reviewed each bid for responsiveness [], based responsibility on that analysis, [and] determined that Haines & Kibblehouse[, Inc.] was the lowest responsive, responsible bidder."[12] IMC Br. Ex. A (Final Det.) at 5. By April 24, 2020 letter, PhilaPort rejected IMC's bid, stating: "[PhilaPort] intends to award the subject project to Haines [&] Kibblehouse, Inc. [IMC's] bid did not meet the twenty percent (20%) self-performance requirement, nor did it meet the requirement for 10% DBE participation. [IMC's] bid has been deemed non-compliant." R.R. at 454a.

On April 28, 2020, IMC filed the Protest seeking to have PhilaPort overturn its rejection, arguing that PhilaPort's reasons for rejecting its bid were baseless. *See* R.R. at 455a-742a. IMC declared that it proposed to self-perform at least 20% of the contract value (or $7,190,698.00), by providing on-site staffing and conducting "all required project scheduling, updating and reporting," and "purchasing, procuring, supplying and delivering to the Project site construction materials and supplies necessary for the Work[.]" R.R. at 463a. IMC further claimed that it satisfied the 10% DBE participation requirement because all but two of the contractors to whom

---

[12] "Based on its evaluation, PhilaPort also rejected [Daniel J. Keating Company's] bid as non-responsive for failure to meet the required minimum diversity participation requirement of 20%. The next-in-line offeror was Haines & Kibblehouse[, Inc.]" PhilaPort Br. at 15; *see also* R.R. at 452a.

9

it made commitments were DBEs properly certified by Philadelphia's Office of Economic Opportunity (Philadelphia's OEO) or the Pennsylvania Unified Certification Program, and the dollar commitments totaled $5,396,000.00 (or 15% of the bid amount). *See* R.R. at 465a, 737a-742a. In support of its claim, IMC contends that PhilaPort expressly incorporated the following inquiry (DBE Question) from Project No. 19-131.1 IFB Addendum No. 3 into the current IFB:

> Q7: Relative to DBE participation, please confirm that [(Philadelphia's OEO)] database is another approved source for soliciting certified subcontractors and vendors.
>
> A7: [Philadelphia's OEO] database is another approved source for soliciting certified subcontractors and vendors. The accepted categories of inclusion for [Project No. 19-131.1] may be found in Bid Document, Part 3, [Diversity Plan].

R.R. at 710a (emphasis omitted).

On May 4, 2020, PhilaPort's Contracting Officer responded to IMC's Protest, reiterating that IMC's bid failed to meet the IFB's 20% self-performance and 10% DBE participation requirements. R.R. at 743a-750a. Regarding IMC's purported self-performance, the Contracting Officer stated:

> IMC's [P]rotest confirms the accuracy of PhilaPort's determination. In its attempt to justify meeting the 20% self-performance requirement IMC confirmed that its calculation of self-performance is largely based on the cost of materials procured from third[]parties by IMC. [*See* R.R. at 463a-464a.] For example, IMC seeks credit in the amount of $2,482,267[.00] for the purchase of steel and concrete; another $1,806,919[.00] for the purchase of structural steel; and $2,087,256[.00] for the purchase of electrical supplies. IMC is clearly seeking credit for the value of materials and supplies manufactured by third parties. IMC will not be manufacturing or installing the materials on site for which it seeks credit, and therefore its reliance on the value of those supplies is misplaced simply because they are to be procured by IMC. Indeed, according to IMC's own calculation

10

disclosed in the Protest, the IMC activities associated with the purchase and delivery of materials required for the work (including the purchase price of the materials) accounts for over $11,000,000[.00] of IMC's self-performance calculation, while IMC['s] 'On-Site Staffing' accounts for only $1,500,000[.00], or 4.1% of the estimated contract price.

R.R. at 748a.

Relative to IMC's proposed DBE participation, the Contracting Officer revealed that PhilaPort was unable to validate the DBE status of six of IMC's proposed subcontractors.[13] *See* R.R. at 452a. Those six companies accounted for $2,447,000.00 (or 45% of the total DBE commitment) and, after deducting the value of those proposed commitments, IMC's DBE participation was only $2,949,000.00 (or 8.2% of the total bid). *See* R.R. at 452a, 748a-749a. The Contracting Officer clarified that the DBE Question was not incorporated by reference in the IFB for this Project. *See* R.R. at 749a n.1. The Contracting Officer added: "[E]ven if the proposed subcontractors were certified by [Philadelphia's OEO], that certification was not listed as one of the third-party certifications accepted by PhilaPort." R.R. at 749a.

On May 14, 2020, IMC appealed from the Contracting Officer's determination to PhilaPort's Executive Director, arguing:

Because IMC's bid is fully responsive to PhilaPort's bid solicitation, a decision to reject IMC's [P]rotest, and thereby affirm the [C]ontracting [O]fficer's decision that IMC's bid is nonresponsive, is contrary to the express provisions of the Project's Bid Documents and, therefore, is arbitrary and capricious and/or an abuse of discretion. Moreover, a decision to uphold the [C]ontracting [O]fficer's rejection of IMC's bid on the basis of PhilaPort's new (May 4, 2020) and

_____

[13] In its May 4, 2020 letter and its Final Determination, although PhilaPort misstated that it could not confirm the DBE status of *five* of IMC's proposed subcontractors, it listed *six* of them. *See* R.R. at 452a, 748a; *see also* Final Det. at 7. The six proposed subcontractors were: Larry McCrae, Inc. ($1,700,000.00); Swipes Heavy Hauling, LLC ($25,000.00); American Power Electrical Supply Co. ($600,000.00); Hutchinson Cabinets, LLC ($40,000.00); BFC, LTD ($32,000.00); and City Cleaning Company, Inc. ($50,000.00). *See* R.R. at 452a, 737a, 747a, 755a; *see also* Final Det. at 7.

11

previously unstated interpretation of the 20% self-performance requirement in the Bid Documents is exclusionary, anti-competitive and contrary to law.

R.R. at 751a. Specifically, IMC claimed that the Bid Documents did not limit the Work to actual performance of labor on the Project site but, rather, included as part of the Work the supply, delivery and/or installation of material needed to construct the building. *See* R.R. at 752a.

IMC further asserted that "PhilaPort's rejection of IMC's fully responsive bid on the grounds that IMC allegedly failed to meet the 10% DBE requirement contradicts the express terms and provisions of the Bid Documents and is arbitrary and capricious." R.R. at 755a. IMC contended that, since PhilaPort incorporated the DBE Question in Addendum No. 2, Philadelphia's OEO database was an approved source for soliciting DBE-certified subcontractors and vendors, IMC's use thereof to confirm its contractors' DBE status cannot be a basis to reject IMC's bid. *See* R.R. at 756a; *see also* R.R. at 242a, 710a, 730a. IMC also claimed that all six of the subcontractors were, in fact, listed in Philadelphia's OEO database as either MBEs or WBEs and, thus, were DBEs. *See* R.R. at 756a. IMC acknowledged that PhilaPort did not include Philadelphia's OEO as one of the entities capable of certifying DBE status for this IFB, but argued that PhilaPort did not represent that its list contained the only acceptable third-party certifying entities. *See* R.R. at 755a-756a.

On May 19, 2020, PhilaPort's Executive Director and Chief Executive Officer Jeff Theobald (Theobald) agreed with the Contracting Officer and issued the Final Determination denying IMC's Protest on the basis that IMC's bid failed to meet the IFB's 20% self-performance and 10% DBE performance requirements. *See* IMC Br. Ex. A. On June 2, 2020, IMC appealed to this Court. On June 12, 2020, Haines & Kibblehouse, Inc. filed a Notice of Intervention.

12

IMC argues that PhilaPort erred by denying IMC's Protest on the basis that its bid was non-responsive. IMC asserts that it satisfied the IFB's 20% self-performance and 10% DBE participation requirements, and was the lowest responsive and responsible bidder on the Project and, thus, PhilaPort's rejection of its bid was arbitrary and capricious and/or an abuse of discretion or, in the alternative, was exclusionary, anti-competitive, and contrary to law. IMC maintains that, under the circumstances, a Contract awarded to any company other than IMC would be void as a matter of law.

Initially, as a Commonwealth agency, PhilaPort is governed by the Commonwealth Procurement Code (Procurement Code).[14] *See* Section 102(a) of the Procurement Code, 62 Pa.C.S. § 102(a). "The [Procurement] Code sets forth the scope and standard of review in an appeal from a determination denying a bid protest." *Pepco Energy Servs., Inc. v. Dep't of Gen. Servs.*, 49 A.3d 488, 491 n.3 (Pa. Cmwlth. 2012). Section 1711.1(i) of the Procurement Code states:

> Th[is C]ourt shall hear the appeal, without a jury, on the record of determination certified by the purchasing agency. The [C]ourt shall affirm the determination of the purchasing agency unless it finds from the record that the determination is arbitrary and capricious, an abuse of discretion or is contrary to law.

62 Pa.C.S. § 1711.1(i).

This Court has ruled:

> [A]dministrative action is 'arbitrary and capricious where it is unsupportable on any rational basis because there is no evidence upon which the action may be logically based.' *Lynch v. Urban Redevelopment Auth*[.] *of Pittsburgh*, . . . 496 A.2d 1331, 1335 ([Pa. Cmwlth.] 1985).

---

[14] 62 Pa.C.S. §§ 101-2311.

The United States Supreme Court has summarized the concept of arbitrary and capricious as follows:

> The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. In reviewing that explanation, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . . . The reviewing court should not attempt itself to make up for [an agency's] deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given.

> *Motor Vehicle M[frs.] Ass['] n v. State Farm Mut[.] Auto[.] Ins[.] Co.*, 463 U.S. 29, 43 . . . (1983) (citation and internal quotation marks omitted).

*Cary v. Bureau of Pro. & Occupational Affairs*, 153 A.3d 1205, 1210 (Pa. Cmwlth. 2017). "[A]n abuse of discretion occurs if, in reaching a conclusion, the law is overridden or misapplied or judgment exercised is manifestly unreasonable or is the result of partiality, prejudice, bias, or ill will." *CenturyLink Pub. Commc'ns, Inc. v. Dep't of Corr.*, 109 A.3d 820, 827 n.13 (Pa. Cmwlth. 2015) (quoting *Henderson v. Unemployment Comp. Bd. of Rev.*, 77 A.3d 699, 713 (Pa. Cmwlth. 2013)).

Section 512(e) of the Procurement Code requires that "[b]ids shall be evaluated based on the requirements set forth in the invitation for bids[.]" 62 Pa.C.S. § 512(e). Section 512(g) of the Procurement Code mandates that PhilaPort award the Contract for the Project to the "lowest responsible bidder."[15] 62 Pa.C.S. § 512(g); *see also* Section 11(a) of the Philadelphia Regional Port Authority Act, 55 P.S. § 697.11(a) ("All construction . . . where the entire cost[ or] value . . . exceeds $10,000[.00] . . .

---

[15] In accordance with the Procurement Code, Section 29 of the Instructions to Bidders declared that, "[i]f PhilaPort awards a Contract, it will be made to the lowest responsive, responsible [b]idder . . . ." R.R. at 33a.

shall be done only under contract or contracts to be entered into by [PhilaPort] with the lowest responsible bidder . . . ."). Section 103 of the Procurement Code defines "responsible bidder" as "[a] bidder that has submitted a responsive bid and that possesses the capability to fully perform the contract requirements in all respects and the integrity and reliability to assure good faith performance." 62 Pa.C.S. § 103. A "responsive bid" is one "which conforms in all material respects to the requirements and criteria in the invitation for bids." *Id.*

Moreover, "[b]idding instructions control whether bidding specifications are considered mandatory or waivable.[16] *See* [*Glasgow, Inc. v. Pa. Dep't of Transp.*, 851 A.2d 1014 (Pa. Cmwlth. 2004)] (noting the agency removed any discretion it had to waive certain submission errors by making the requirement in question mandatory in the bidding instructions)." *Ctr. for Climate Strategies, Inc. v. Dep't of Envtl. Prot.*, 194 A.3d 742, 744-45 (Pa. Cmwlth. 2018). "Where specifications set forth in a bidding document are mandatory, they must be strictly followed for the bid to be valid, and a violation of those mandatory bidding instructions constitutes a legally disqualifying error for which a public agent may reject a bid." *Ctr. for Climate Strategies, Inc.*, 194 A.3d at 744 (quoting *Glasgow, Inc.*, 851 A.2d at 1017 (citation omitted)). "Bids that fail to conform to all mandatory requirements and criteria contained in an invitation for bids are non-responsive to the invitation." *Ctr. for Climate Strategies, Inc.*, 194 A.3d at 745.

---

[16] Here, the IFB's 20% self-performance and 10% DBE participation requirements were mandatory. However, even if they were waivable, PhilaPort could not have waived them because, although an agency has the discretion to waive non-material bid defects, it may only do so "where the non-compliance[:] (1) does not deprive the agency of the assurance that the contract will be entered into and performed[;] and (2) does not confer a competitive advantage on the bidder[.]" *Glasgow, Inc. v. Pa. Dep't of Transp.*, 851 A.2d 1014, 1017 (Pa. Cmwlth. 2004). Because IMC's non-compliance with the IFB's self-performance and/or DBE participation requirements would have deprived PhilaPort of the assurance that IMC would perform under the Contract (by allowing it to disregard certain significant provisions) and would have conferred a competitive advantage on IMC (by allowing it to subcontract more than its competitors), PhilaPort could not have waived them.

### 1. Self-Performance

IMC claims that PhilaPort wrongly determined that its bid was non-responsive on the grounds that IMC did not meet the 20% self-performance requirement, where the Bid Documents defined "Work" to include IMC's purchasing and delivering materials to the Project site. Specifically, IMC asserts that "PhilaPort did not state, at any time prior to the [C]ontracting [O]fficer's May 4, 2020 [determination], that the 'costs of materials procured from third[]parties' and supplied and/or delivered by the bidder to the Project were not eligible for the 20% self-performance requirement." R.R. at 754a. IMC further argues that the Contracting Officer's post-bid change to PhilaPort's Bid Documents was anticompetitive and exclusionary and, therefore, contrary to the Commonwealth of Pennsylvania's well-settled public bidding law.

The IFB and accompanying Bid Documents mandated that the winning bidder "shall perform on the site[17] and with [its] own organization at least [20%] of the total amount of Work to be performed under this [C]ontract." R.R. at 57a, 307a. The "Work" for the Project under the Contract consisted of "the labor or service to be performed and/or the material and/or equipment to be supplied, delivered and/or installed . . . ." R.R. at 147a; *see also* R.R. at 147a-155a. In addition, Section 11(a) of the Act states, in relevant part, that PhilaPort's construction "contracts shall provide that the . . . corporation entering into such contract with [PhilaPort] will pay for all materials furnished and services rendered for the performance of the contract . . . ." 55 P.S. § 697.11(a).

---

[17] "Site" was defined in Section I.A of the General Conditions as "the location where the construction or services will be performed or where the materials or equipment will be used pursuant to the Contract." R.R. at 146a.

As is clear from the Bid Documents, PhilaPort fully anticipated that the winning bidder for the Project would enlist subcontractors[18] to perform a significant majority of the Work at the site. PhilaPort was also aware "that most general contractors in the Philadelphia market do not self-perform work and, if they do, they do not perform anywhere near 20%." R.R. at 244a (Addendum No. 2). Nevertheless, PhilaPort did not define *self-performance* in the IFB or the Bid Documents. Moreover, when one of the bidders inquired of PhilaPort whether the successful contractor's Work included "labor - actual trade work . . . [,] Project Management and/or purchase of materials?," PhilaPort merely responded: "See [Revised] Bid Form . . . ." R.R. at 358a. In the Revised Bid Form, PhilaPort added that the Work did not include profit, overhead, or the costs of procuring insurance and bonds, and further provided examples of the types of Work PhilaPort intended the bidder to self-perform - "earthwork, paving, brickwork, roofing, etc." R.R. at 307a; *see also* R.R. at 298a. Although PhilaPort could have specified, as it did for insurance and bond procurement, that the purchase and delivery of materials and supplies did not count toward the 20% self-performance calculation, it did not do so. *See* R.R. at 748a. Rather, PhilaPort's definition of Work specifically included "materials . . . to be supplied, delivered and/or installed[.]" R.R. at 147a. Therefore, the bidders were left to interpret whether self-performance of the work meant actual labor, or whether it included the purchase price of materials and supplies.

> This Court has explained:

> The fundamental rule in construing a contract is to ascertain and give effect to the intention of the parties. *Lower Frederick T*[*wp.*] *v. Clemmer*, . . . 543 A.2d 502, 510 ([Pa.] 1988). 'The intention of the parties must be ascertained from the document itself, if its terms are clear and unambiguous.'

---

[18] Section I.A of the General Conditions defined "subcontractor[s]" as "persons, firms, or corporations having a direct contract with the Contractor to perform a portion of the Work or to furnish materials or equipment." R.R. at 146a.

*Sun Co*[.]*, Inc. (R&M) v. P*[*a.*] *T*[*pk.*] *Comm*[']*n*, 708 A.2d 875, 878 (Pa. Cmwlth. 1998). A contract is ambiguous if it is 'reasonably susceptible of different constructions and capable of being understood in more than one sense.' *Id*. Determination of whether a contract is ambiguous is a question of law.

*Gior G.P., Inc. v. Waterfront Square Reef, LLC*, 202 A.3d 845, 857 (Pa. Cmwlth. 2019). "As with contracts, we construe any ambiguity in the Instructions [to Bidders] against the [a]uthority as drafter of the document." *Jay Twp. Auth. v. Cummins*, 773 A.2d 828, 832 n.3 (Pa. Cmwlth. 2001). Moreover, this Court "may not supply a reasoned basis for [PhilaPort's] action that [PhilaPort] itself has not given." *Cary*, 153 A.3d at 1210 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 29). Here, because the IFB's language was subject to multiple interpretations, it was ambiguous and, therefore, must be construed against PhilaPort.

IMC represented that it would perform at least 20% of the Work (or an estimated $7,190,698.00), consisting of:

> General conditions, general requirements, project-specific management, project-specific accounting, project-specific scheduling, utility coordination for permanent services, quality control/assurance testing [and] inspections, security, **procurement/purchasing of materials/supplies**, project-specific health [and] safety, project-specific COVID-19 protocols pertaining to health [and] safety, logistics planning and direction, [o]wner meetings, subcontractor coordination, building information modeling, and warranty management. It is specifically noted that costs associated with profit, overhead, insurance and bonds will not be included in the 20% of the Work performed by [IMC].

R.R. at 720a (emphasis added). In its Protest, IMC clarified that its "direct purchase, supply and delivery of materials to the Project site will meet or exceed the 20% self-

18

performance requirement for the Project," R.R. at 463a, and would include some or all of the following:

| Description | Self-Perform Tasks | Est. Amount |
|---|---|---|
| Cast-in-Place Concrete | Reinforcing Steel/Concrete Supply - Purchase/Delivery | $ 2,482,267.00 |
| Pre-Cast Concrete | Panel Fabrication - Purchase/Delivery | $ 810,556.00 |
| Structural Steel | Steel Fabrication - Purchase/Delivery | $ 1,806,919.00 |
| Misc. Metals Fabrication | Steel Fabrication - Purchase/Delivery | $ 101,834.00 |
| Exterior Wall Panels | Panel Fabrication - Purchase/Delivery | $ 886,185.00 |
| Doors/Frames/Hardware | Purchase/Delivery | $ 68,225.00 |
| Metal Canopy System | Purchase/Delivery | $ 99,169.00 |
| Loading Dock Equipment/OH Doors | Purchase/Delivery | $ 563,796.00 |
| Fire Protection | Pumps/Pipes/Heads - Purchase/Delivery | $ 543,458.00 |
| HVAC | Equipment/Sheet Metal - Purchase/Delivery | $ 821,978.00 |
| Electrical | Switchgear/Lighting/Alarm/Conduit/Wire - Purchase Delivery | $ 2,087,256.00 |
| Special Foundations/CMCs | Concrete Supply - Purchase/Delivery | $ 926,050.00 |
| General Conditions | IMC On-Site Staffing | $ 1,500,000.00 |

Total:  $12,697.693.00[19]

*See* R.R. at 463a-464a.  IMC added that its "[s]elf-performed purchase and delivery of materials [will be] used in conjunction with DBE/MBE/WBE contracting to reduce [the] financial burden on selected DBE/MBE/WBE subcontractors and, therefore, further [sic] that participation levels are met or exceeded."  R.R. at 464a n.14.

In the Final Determination, Theobald concluded that IMC failed to meet the 20% self-performance requirement of the IFB, explaining:

[19] IMC clarified that the "[t]otal estimated amount will be finalized upon [C]ontract award and contracting with subcontractors/suppliers, with total self-performed Work to be 20% or more, excluding any profit, overhead, insurance and bonds."  R.R. at 464a n.14.

IMC's reliance on the cost of the materials manufactured by and procured from third[ ]parties does not meet the IFB's requirement to self-perform at least 20% of the work with its own organization.  As support for its interpretation, IMC cites to the broad definition of 'Work' in the General Conditions of the IFB to include the value of supplies procured from third[ ]parties.  IMC ignores, however, the express limitations on the type of work that qualifies for the self-performance calculation under IFB Addendum No. 4.  The latter amendment expressly limited the work applicable for the 20% self-performance calculation as work performed 'on the site and with his own organization . . . exclusive of profit, overhead and the costs of procuring insurance and bonds.'  This is clearly a subset of all 'Work' as defined by the General Conditions of the Contract.  **Under any reasonable interpretation, the value of the materials** (e.g., concrete, steel, etc.) **purchased by IMC cannot be included in the 20% calculation of 'self-performance**[.]'[]  Indeed, according to IMC's own [P]rotest, IMC seeks self-performance credit for the procurement of more than $3 million worth of concrete it will not lay, almost $2 million for steel it does not manufacture, and over $2 million for electrical supplies it will not install – all while estimating only incurring $1.5 million for 'IMC On-Site Staffing.'  [*See* R.R. at 464a].  The Contracting Officer's determination that IMC's bid is nonresponsive for failure to meet the 20% self-performance requirement is reasonable.

Finally, IMC alleges in its [r]esponse [to the Contracting Officer's determination] that excluding the supply and delivery of materials from eligibility for the Project's 20% self-performance requirement is 'anticompetitive and contrary to law.'  [*See* R.R. at 755a].  This argument is an untimely challenge to the terms of the IFB.  *See* 62 Pa.C.S. § 1711.1(b).[20]  Although IMC alleges it had no reason to

---

[20] Section 1711.1(b) of the Procurement Code states, in relevant part:

If the protestant is a bidder . . . , the protest shall be filed with the head of the purchasing agency within seven days after the aggrieved bidder . . . knew or should have known of the facts giving rise to the protest . . . . If a bidder . . . fails to file a protest or files an untimely protest, the bidder . . . shall be deemed to have waived its right to protest the solicitation or award of the contract in any forum.

protest the terms because the Contracting Officer's interpretation was not known prior to the [P]rotest reply, the IFB terms were unambiguous and clear: the contractor is to perform 20% of the work with its 'own forces' while 'on-site' and excluding overhead. **The value of purchase orders to third-party manufacturers for materials and supplies procured by IMC does not qualify for inclusion in the 'self-performance' calculation** as defined in the [R]evised Bid Form.

Final Det. at 9.

The IFB's 20% self-performance requirement was mandatory and had to be "strictly followed for the bid to be valid[.]" *Ctr. for Climate Strategies, Inc.*, 194 A.3d at 744 (quoting *Glasgow, Inc.*, 851 A.2d at 1017). However, since PhilaPort was not clear in the IFB, the Bid Documents or the Addenda regarding whether the 20% self-performance included or excluded the purchase price of materials and supplies, this Court cannot hold that IMC's bid failed to satisfy that mandatory criteria, or that IMC's bid did not "conform[] in all material respects to the requirements and criteria in the [IFB]" and, thus, was not responsive. 62 Pa.C.S. § 103. Accordingly, PhilaPort erred by concluding that IMC's bid was non-responsive on the grounds that IMC's bid did not meet the IFB's 20% self-performance requirement.

---

62 Pa.C.S. § 1711.1(b); *see also* Section 19.B.2 of the Instructions to Bidders (Bid Protest Procedure), R.R. at 20a. Specifically, "[w]here the protest challenges a term or provision of the invitation for bids . . . or the issue that it raises was apparent from the invitation for bids . . . , the . . . bidder must file that protest no later than seven days after it has notice of that term or provision[.]" *UnitedHealthcare of Pa., Inc. v. Dep't of Hum. Servs.*, 172 A.3d 98, 108 (Pa. Cmwlth. 2017).

Here, despite that the self-performance requirement was stated in the IFB at the time it was issued and IMC's failure to meet that requirement was one of the two bases on which PhilaPort rejected IMC's bid, IMC did not argue in its Protest that the IFB's self-performance requirement was anti-competitive and/or contrary to law. Accordingly, IMC waived that argument, and this Court will not address it.

Even if this Court were to conclude that IMC was unaware of PhilaPort's interpretation of the self-performance requirement until it received the Contracting Officer's May 4, 2020 determination, and it was permitted to file a supplemental protest, IMC's challenge to the Contracting Officer's determination was still invalid because it was made by a May 14, 2020 letter, more than seven days after IMC "knew or should have known of the facts giving rise" to that challenge. 62 Pa.C.S. § 1711.1(b).

## 2. DBE Participation

IMC also asserts that PhilaPort wrongly concluded that it was non-responsive on the grounds that IMC did not meet the 10% DBE performance requirement, when IMC's subcontractors are listed on Philadelphia's OEO database[21] as MBEs or WBEs and, thus, were properly certified as DBEs for purposes of DBE participation and commitment on the Project. In addition, IMC claims that, because PhilaPort's conclusion conflicts with the express terms and provisions of the Bid Documents, PhilaPort's determination was arbitrary and capricious and/or an abuse of discretion.

However, the IFB specified that "[b]idders must comply with the requirements of the [Diversity] Plan to be eligible for the award of the Contract[.]" R.R. at 32a-33a. Section VI.B.1.a of the Diversity Plan (Participation Level) required that HUB participation shall be at least 20% of the Contract value, and that "participation for each award must include at least 2 of the categories that are identified as HUB with no less than 5% participation for every category being included." R.R. at 222a (emphasis omitted). With Addendum No. 4, PhilaPort issued the Revised Diversity Plan to comply with federal grant funding requirements. Therein, PhilaPort reiterated that the MPL for the Project was 20% of the total Contract value, but declared that 10% must be by DBEs, with the remaining 10% by any combination of HUBs.[22] *See* R.R. at 320a, 331a.

---

[21] IMC claimed that its subcontractors were also certified as MBEs and WBEs on the Pennsylvania UCP; however, because IMC based its DBE performance argument on certifications it obtained from Philadelphia's OEO database, whether the subcontractors are certified as MBEs and WBEs on the Pennsylvania UCP is immaterial.

[22] As a federal mandate, the 10% DBE participation was a material requirement of the IFB. In addition, Section 2.I of the IFB's Instructions to Bidders (Familiarity with Proposed Work) declared, in pertinent part: "The [b]idder acknowledges that [it] is fully aware of [PhilaPort's] status as a governmental entity in relation to this Project and the requirements of [a]pplicable [l]aws generally . . . ." R.R. at 10a.

Pursuant to the Revised Diversity Plan, bidders were to include separate HUB Solicitation and Commitment Statements for *each different* HUB type. *See* R.R. at 340a-344a. The DBE Solicitation and Commitment Statement specified in three places that a minimum of 10% DBE participation was required. *See* R.R. at 340a. The Revised Diversity Plan also included examples of compliant versus non-compliant HUB submissions. *See* R.R. at 351a. All of the compliant submission examples reflected *at least* 10% DBE participation, with the remaining 10% by other HUBs. *See* R.R. at 351a.

IMC listed 29 subcontractors on its DBE Solicitation and Commitment Statement. *See* R.R. at 737a-738a. PhilaPort determined, and IMC admitted, that six of the subcontractors listed on IMC's DBE Solicitation and Commitment Statement *were not DBEs* but, rather, were MBEs or WBEs.[23] *See* R.R. at 759a; *see also* IMC Br. at 29. IMC's argument that those six subcontractors, as MBEs and WBEs, fit PhilaPort's definition of, and should be counted as, DBEs because they are similarly "presumed socially and economically disadvantaged," *see* R.R. at 320a, has no record basis. Rather, the IFB made a clear distinction between DBEs and other certified HUBs, and nothing in the IFB suggested they were interchangeable.

Moreover, DBE certification is not a matter of bidder interpretation, but third-party certification. PhilaPort specified in the Revised Diversity Plan, under the heading "Accepted Certifications," that "PhilaPort accepts approved third-party certifications from any of the following entities . . . [including UCP] . . . ." R.R. at 322a (emphasis omitted). The heading and the "from any of the following entities" language made clear that the list was exclusive. R.R. at 322a. Because Philadelphia's

---

[23] Larry McCrae, Inc. (Philadelphia OEO - MBE); Swipes Heavy Hauling, LLC (Philadelphia OEO - WBE); American Power Electrical Supply Co. (Philadelphia OEO - MBE); Hutchinson Cabinets, LLC (Philadelphia OEO - WBE); BFC, LTD (Philadelphia OEO - WBE); and City Cleaning Company, Inc. (Philadelphia OEO - WBE). *See* R.R. at 737a-738a, 759a.

OEO database was not among the entities listed, it was not a third-party certifier from which PhilaPort would accept certifications.

IMC nevertheless relied on Philadelphia's OEO database, *see* R.R. at 759a, and now argues that PhilaPort approved it as an acceptable certification source by incorporating the DBE Question into the current IFB by Addenda Nos. 2 and 6. However, the record belies this argument. It is clear that, although Addenda Nos. 2 and 6 incorporated questions and answers previously supplied relative to the Project No. 19-131.1 IFB, the DBE Question was not included among them.[24] *See* R.R. at 241a-260a, 358a. Consequently, Philadelphia's OEO was not one of the entities from whom PhilaPort would accept DBE certifications.[25] Notwithstanding, even if the DBE Question was incorporated into the current IFB and Philadelphia's OEO database certifications were acceptable, since six of the proposed vendors were not DBEs, IMC's proposed DBE participation was less than 10% (i.e., only 8.2%) of the Contract value and, thus, was not responsive to the IFB. *See* R.R. at 748a-749a.

Based on the foregoing, Theobald concluded in PhilaPort's Final Determination:

> The IFB [] clearly requires a 10% DBE commitment that is separate and apart from the commitment to subcontract with concerns in other socio-economic categories. To qualify as

---

[24] The only question/answer PhilaPort incorporated from the Project No. 19-131.1 IFB Addendum No. 3 was:

> Q5: Controlled Modulus Columns (CMCs) is a patented system with only on[e] installer. Will alternative, similar, systems be approved?

> A5: Please see response in [Project No. 19-131.1 IFB] Addendum 1, A3.

R.R. at 244a (emphasis omitted).

[25] IMC claims that "PhilaPort did not notify bidders of any change in PhilaPort's position from [Project] No. 19-131.1 [IFB] allowing [Philadelphia's] OEO database as an approved source for soliciting certified subcontractors and vendors." IMC Br. at 31. However, PhilaPort issued the list of acceptable third-party certifiers with Addendum No. 4 which, pursuant to Section 4.C of the Instructions to Bidders, IMC was responsible for reviewing. *See* R.R. at 12a, 322a.

a DBE, the subcontractor is clearly required to be certified by an approved third-party certifier. The list of approved third-party certifiers is included in IFB Addendum No. 4. IMC's argument that DBE status could be credited absent a DBE certification from an approved entity is inconsistent with the clear and unambiguous terms of the IFB.

Finally, IMC argues it rightfully relied upon certifications by [Philadelphia's OEO] because such certifications were determined to be acceptable under cancelled [Project 19-131.1 IFB] by PhilaPort through the question and answer process. However, [] the revised [current IFB] only incorporated questions and answers from the cancelled IFB, and the question and answer that IMC relies upon related to [Philadelphia's OEO] certification was not incorporated by reference in the [current IFB]. In any event, according to IMC, [Philadelphia's OEO] does not even certify concerns for DBE status. IMC's claim that PhilaPort must recognize other certifications from [Philadelphia's OEO] (WBE, MBE, etc.) as equivalent to the DBE certification required by the IFB is meritless. Reliance on a DBE certification by [Philadelphia's OEO] was not authorized under the current IFB and the Contracting Officer properly deducted the DBE commitment by the amount committed to proposed subcontractors without a DBE certification from an approved certifier. PhilaPort determined that IMC's proposed commitments to certified DBEs was only $2,949,000[.00], or 8.2% of the total bid.

Final Det. at 10-11. Because PhilaPort's Final Determination was based on its consideration of relevant factors and there was no clear error in PhilaPort's judgment, this challenged aspect of PhilaPort's Final Determination was not arbitrary and capricious nor an abuse its discretion. *Cary*; *CenturyLink*.

Based on the foregoing, the IFB's 10% DBE participation requirement was mandatory and had to be "strictly followed for the bid to be valid[.]" *Ctr. for Climate Strategies, Inc.*, 194 A.3d at 744 (quoting *Glasgow, Inc.*, 851 A.2d at 1017). Since IMC failed to satisfy that mandatory criteria, IMC's bid did not "conform[] in all material respects to the requirements and criteria in the [IFB]" and, thus, was not a responsive bid. 62 Pa.C.S. § 103. Accordingly, PhilaPort properly concluded that

25

IMC's bid was non-responsive on the grounds that IMC's bid did not meet the IFB's 10% DBE participation requirement.

## Conclusion

Based on the foregoing, although PhilaPort erred by denying IMC's Protest on the basis that its bid was non-responsive to the 20% self-performance requirement, PhilaPort properly denied IMC's Protest on the basis that IMC's bid was non-responsive to the 10% DBE participation requirement. Because IMC's bid was not responsive, IMC was not a responsive and responsible bidder. *See* 62 Pa.C.S. § 103. Accordingly, PhilaPort's Final Determination is affirmed.

_____
ANNE E. COVEY, Judge

Judge Fizzano Cannon did not participate in the decision in this case.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

IMC Construction,                :
          Petitioner       :
                        :
        v.                 :
                        :
The Port of Philadelphia a/k/a   :
PhilaPort,                 :   No. 516 C.D. 2020
          Respondent    :

## O R D E R

AND NOW, this 4th day of December, 2020, The Port of Philadelphia a/k/a PhilaPort's May 19, 2020 Final Determination is affirmed.

_____
ANNE E. COVEY, Judge